Anne Y. EWING, Individually and as Administratrix of the Estate of William S. Ewing, Plaintiff Below, Appellant,

v.

Joseph R. BECK, M.D., Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted: Dec. 30, 1986.
Decided: Jan. 27, 1987.

C. Waggaman Berl, Jr., (argued) Wilmington, for plaintiff below, appellant.

William D. Bailey, Jr., (argued) of Bayard, Handelman & Murdoch, P.A., Wilmington, for defendant below, appellee.

Before CHRISTIE, C.J., and MOORE and HOLLAND, JJ.

HOLLAND, Justice.

This is a medical malpractice action brought by Anne Y. Ewing, the widow of William S. Ewing, who was a patient of the defendant, Dr. Joseph R. Beck. This is an appeal from the Superior Court's grant of Summary Judgment in favor of the defendant.[1] The Superior Court granted Summary Judgment on the grounds that the plaintiff's medical malpractice claim was barred by the applicable statute of limitations. 18 *Del.C.* § 6856.[2] Upon behalf of the plaintiff, it is advocated that this medical malpractice claim should not be barred because the continuing treatment doctrine is applicable.

In both of its thorough and thoughtful opinions, the Superior Court noted that al-

---

1. Vice Chancellor Berger was assigned to the Superior Court pursuant to Article IV, Section 13 of the Delaware Constitution. On May 30, 1985, by letter opinion, the defendant's request for Summary Judgment was granted in part and denied in part. By letter opinion dated May 1, 1986, after reargument, the Superior Court modified its earlier decision and granted the defendant's request for Summary Judgment in its entirety.

2. 18 *Del.C.* § 6856 provides:

§ 6856 General limitations.

No action for the recovery of damages upon a claim against a health care provider for person-

al injury, including personal injury which results in death, arising out of malpractice shall be brought after the expiration of 2 years from the date upon which such injury occurred; provided, however, that: (1) Solely in the event of personal injury the occurrence of which, during such period of 2 years, was unknown to and could not in the exercise of reasonable diligence have been discovered by the injured person, such action may be brought prior to the expiration of 3 years from the date upon which such injury occurred, and not thereafter; ...

though the continuing treatment doctrine has received judicial recognition in Delaware, no Delaware Court has ever affirmatively held that the continuing treatment doctrine applies.

Confronted with the clear language of the applicable statute of limitations, the Superior Court concluded that since the continuing treatment doctrine had not been enacted by the Delaware legislature or adopted by this Court, the continuing treatment doctrine was not applicable and the plaintiff's claims were time barred. We affirm and take this opportunity to analyze the concept of continuing treatment and reconcile it with the prior cases that have recognized the significance of a continuity of medical treatment.

### FACTS

William S. Ewing was a patient of the defendant, Dr. Joseph R. Beck, from August 1974 until September 25, 1980.[3] Mr. Ewing died from metastized bladder cancer on November 5, 1980. In August 1974, Mr. Ewing went to see Dr. Beck, a urologist, after discovering blood in his urine. Mr. Ewing was hospitalized for a cystoscopy. The pathology report from the urine cytology indicated the presence of malignant cells compatible with transitional cell carcinoma. Mr. Ewing was hospitalized for further testing in early September, 1974, and the results of those tests indicated the strong possibility of a malignant tumor.

On October 20, 1974, Mr. Ewing again was admitted to the hospital for possible cancer of the bladder and the hospital records reveal that Dr. Beck performed a transurethal resection of a bladder tumor. Mr. Ewing was hospitalized again in December, 1974, and January, 1975, for follow up testing. In both instances, the tests revealed the presence of malignant cells in the urine.

According to Mrs. Ewing, Dr. Beck told her and her husband after the first cystoscopy that he was not at all disturbed about Mr. Ewing's condition and that it was something like varicose veins of the bladder. In March, 1975, after another follow up hospitalization and testing procedure, Dr. Beck asserts that he told Mr. Ewing that Mr. Ewing had bladder cancer and was going to be treated with a drug called Thio-Tepa. Mrs. Ewing admits having been told that her husband was going to be treated with Thio-Tepa, but also testified that neither she nor her husband were ever told that he had cancer or that Thio-Tepa was a drug used in cancer treatment.

From the spring of 1975 until early 1979, Mr. Ewing was hospitalized periodically for cystoscopies and related testing. For the most part, the laboratory reports indicated the absence of malignant cells or other evidence of a recurrence of the bladder tumor. In January and February, 1979, cytology reports indicated cells suggestive of malignancy, but in early March, 1979, the report again was negative. Testing in May and June, 1979, revealed the presence of malignant tumor cells and a biopsy in June, 1979, indicated that the original bladder cancer had spread to the prostate gland. When Mr. Ewing was discharged from the hospital on June 22, 1979, the discharge diagnosis was carcinoma of the bladder, anaplastic in type, invading the prostate.

Mrs. Ewing admits in her deposition that, in the summer of 1979, she and her husband were told by Dr. Beck that Mr. Ewing had cancer of the prostate and that Dr. Beck recommended radiation treatment. On July 10, 1979, prior to the commencement of the radiation therapy, Mr. Ewing had an appointment with Dr. Beck to discuss his diagnosis and the reason for the

---

**3.** William S. Ewing was a patient under his care and observation for the period from 1974, when he was referred in August of that year by Dr. Andrew Georgieff with a clinical diagnosis of cancer of the bladder, to September 25, 1980, when he was referred to Michael J. Droller, M.D., Brady Urological Institute, Johns Hopkins Hospital, Baltimore, Maryland. (Affidavit of Dr. Beck).

referral to a radiation specialist.[4] Dr. Beck states that in 1979, Mr. Ewing was advised that his bladder cancer had returned and had spread to the prostate. However, Mrs. Ewing maintains that they were never told by Dr. Beck about Mr. Ewing's previous bladder cancer and they were both led to believe that the cancer of the prostate was treatable and not something to worry about.

Mrs. Ewing acknowledges that Dr. Beck referred Mr. Ewing to Dr. Carlo A. Cuccia, a specialist in the treatment of cancer, for radiation therapy. Mr. Ewing had an appointment and consulted with Dr. Cuccia on July 16, 1979. Dr. Cuccia testified that he told Mr. Ewing that Mr. Ewing had cancer of the bladder which had spread to his prostate. Dr. Cuccia also testified that Mr. Ewing's condition was virtually incurable at that time and that Mr. Ewing was fully aware of this prognosis.

After radiation therapy with Dr. Cuccia was concluded in November, 1979, Dr. Beck resumed his care of Mr. Ewing. At least once a month, from January, 1980, through his death in November, 1980, Mr. Ewing's condition was monitored by tests and other procedures conducted during hospitalizations and on an out-patient basis. Beginning in February, 1980, the urine cytology reports again indicated the presence of malignant cells. In June, 1980, another urologist, Dr. Gueco, was brought in by Mr. Ewing to provide a second opinion. The results of the biopsies performed by Dr. Gueco were non-diagnostic and the urine cytology continued to reveal malignant cells. In September, 1980, in addition to a cystoscopy, Mr. Ewing's family insisted upon a CAT scan. The CAT scan revealed tumors on the liver. According to Mrs. Ewing, when she and her husband were informed by Dr. Beck of the results of the CAT scan, Mr. Ewing was completely shocked and fell to pieces.

In October, 1980, Mr. Ewing received one chemotherapy treatment at Johns Hopkins Hospital in Baltimore, Maryland. Dr. Droeller, the physician to whom Mr. Ewing had been referred at Johns Hopkins, told Mr. Ewing's daughter that once the cancer had spread to the liver, it was too late to do anything. Mr. Ewing returned to Wilmington and saw a cancer specialist, Dr. Frelick, who advised that Mr. Ewing was too weak to undertake a second chemotherapy treatment. Mr. Ewing died on November 5, 1980.

## THE PARTIES' CONTENTIONS

The Complaint was filed on August 5, 1982 and alleges, in part, that Dr. Beck

(1) failed to advise decedent (Mr. Ewing) or his family of the existence of cancer of the bladder;

(2) failed to initiate appropriate treatment for bladder cancer;

(3) continued to treat bladder cancer when he was not qualified for such treatment; and

(4) failed to refer the decedent (Mr. Ewing) to a specialist for treatment of cancer.

Dr. Beck contends that the action is time barred under the applicable statute of limitations, 18 *Del.C.* § 6856. In particular, Dr. Beck contends that the injury occurred no later than July, 1979, by which time Mr. Ewing's bladder cancer had spread to his prostate gland. Thus, both the two-year and three-year limitation periods provided for in 18 *Del.C.* § 6856 had expired by the time this action was filed on August 5, 1982.

Mrs. Ewing tacitly concedes that her claim would be barred if the statute of limitations were not tolled. However, she argues that the continuing treatment doctrine or the doctrine of fraudulent concealment tolls the statute of limitations during the period when Mr. Ewing was being

---

4. Affidavit of Ellen McCarthy, R.N., paragraph 6(f); Affidavit of Joseph R. Beck, M.D., para-graph 9.

treated by Dr. Beck and receiving assurances from him that the treatment was yielding satisfactory results. Mrs. Ewing contends that the statute of limitations did not begin to run until September, 1980, when Dr. Beck ceased treating Mr. Ewing and when Mr. Ewing discovered that the cancer had spread to his liver.

### THE APPLICABLE STATUTE OF LIMITATIONS

The applicable statute of limitations is 18 *Del.C.* § 6856. However, for the purpose of analyzing the plaintiff's claim concerning the applicability of the continuing treatment doctrine, it is appropriate to once again review the history of the relevant statute of limitations prior to the enactment of § 6856. Before 1976, there was no statute of limitations specifically addressing medical malpractice claims. Rather, 10 *Del.C.* § 8118 (now § 8119), the statute of limitations for personal injury claims, governed. That statute provides, in relevant part:

> No action for the recovery of damages upon a claim for alleged personal injury shall be brought after the expiration of two years from the date upon which it is claimed that such alleged injuries were sustained....

In 1968, this Court held that § 8118 also applied to an action for medical malpractice. In *Layton v. Allen,* Del.Supr., 246 A.2d 794 (1968), the Court had to determine when the two year statute of limitations began to run in a case where the injury was "inherently unknowable" and the plaintiff was "blamelessly ignorant." The Court found that § 8118 was ambiguous and concluded that the General Assembly had not intended the statute to bar an action before the harm had manifested itself. *Id.* at 797. The *Layton* Court held that the injury was "sustained" and the time for commencing a lawsuit under § 8118 began when the harmful effect manifests itself.

Following the decision in *Layton,* the "inherently unknowable" rule was applied

in medical malpractice actions with the result that the seemingly finite two year statute of limitations did not begin to run in certain cases until many years after the date of the injury. In 1976, the General Assembly addressed this and other perceived problems relating to medical malpractice litigation by enacting Chapter 68 of Title 18 of the Delaware Code. The new statute of limitations, § 6856, applies specifically to medical malpractice claims and sets a two year period of limitations from the date of injury. The statute provides for only two circumstances under which the two year period may be extended: (1) where the injury was unknown and could not have been discovered in the exercise of reasonable diligence during the two years, in which case an action may be brought within three years from the date of injury [§ 6856(1)]; and (2) where the injured party is under the age of six years, in which case, under certain circumstances, the action may be brought at any time up to the child's sixth birthday [§ 6856(2)].

In *Dunn v. St. Francis Hospital, Inc.,* Del.Supr. 401 A.2d 77, 79 (1979) this Court reviewed the legislative history of the current statute. We noted that the introductory paragraph of the malpractice bill, Chapter 68 in Title 18, of which § 6856 was a part, indicates that the main reason for the passage of the legislation was the concern over the law at that time and the rising costs of malpractice liability insurance. The preamble of the legislation specifically provided:

> "WHEREAS, the General Assembly determined it is *necessary to make certain modifications to its current legal system as it relates to health care malpractice claims* if the citizens of Delaware are to continue to receive a high quality of health care while still assuring that any person who has sustained bodily injury or death as a result of a tort or breach of conduct on the part of a health care provider resulting from professional services rendered, or which should have been rendered, can obtain a prompt de-

termination of adjudication of that claim and receive fair and reasonable compensation from financially responsible health care providers who are able to insure their liability ..." 60 Del.Laws C. 373. (emphasis added).

Moreover, the report to the Governor by the Delaware Medical Malpractice Commission, which drafted the statute stated specifically that:

"The overall effect will be to eliminate the uncertainty created by the present open-ended period of limitations ..." REPORT OF THE DELAWARE MEDICAL MALPRACTICE COMMISSION, pp. 3–4, February 26, 1976.

For many years, prior to the enactment of the malpractice legislation, plaintiffs in medical malpractice cases had urged that various exceptions should be included in the applicable statute of limitations for medical malpractice claims. Plaintiffs, for example, had urged and *Layton* held that the statute of limitations should be extended for injuries that are "inherently unknowable". The legislative history confirms that all of these arguments were presented to the Delaware legislature prior to the enactment of 18 *Del.C.* § 6856 and that the Delaware legislature knowingly chose to adopt a limited hybrid statute of limitations. In other words, there is one period (two years) applicable to injuries discovered at the time of the wrongful act and a different period (three years) for "inherently unknowable" injuries. See *Dunn, supra,* at page 81. It clearly appears on the face of the statute of limitations for medical malpractice claims that § 6856(1) is an attempt by the Delaware legislature to both codify the "inherently unknowable" injury rule of the *Layton* case, and to limit

it to three years. *Dunn, supra.* at page 79.

## CONTINUING TREATMENT DOCTRINE

■ The plaintiff argues that the relationship between a doctor and patient is very special. Because of that special relationship, when there is a long period of treatment on a regular and continuing basis, the plaintiff argues that the statute of limitations should not run while the period of treatment continues, because to hold otherwise would force the patient to terminate the relationship with their physician whenever there was a "smattering of doubt"[5] concerning the treatment, and it would have the practical effect of destroying the usual attributes of the physician/patient relationship.[6]

■ Under the "pristine" continuous treatment doctrine, the mere fact that there has been continuous treatment, whether negligent or not, for *a condition* occasioned by a prior negligent act, is sufficient to start the statute of limitations running only at the end of the course of treatment. See *Tamminen v. Aetna Cas. & Sur. Co.,* 109 Wis. 536, 327 N.W.2d 55 (1982). Under this definition of the continuous treatment rule, the statute of limitations for a medical malpractice action would begin to run on the last day the plaintiff received treatment from the defendant health care provider for the *same or related condition* which is the subject matter of the Complaint, whether or not negligence continued throughout the entire course of treatment. The policy underlying the continuous treatment doctrine seeks to maintain the physician/patient relationship in the belief that the most efficacious medical care will be obtained when

---

5. Opening Brief for Appellant at 12.

6. Such a theory is not a continuous treatment doctrine but is more appropriately described as the doctrine of termination of relationship. Under the latter theory, the statute of limitations would not commence to run as long as the doctor/patient relationship continues, even

though a portion of the treatment or the last day of it had nothing to do with the condition relevant to the alleged negligent acts. (Examples of the physician/patient relationship doctrine may be found in *Hundley v. St. Francis Hospital,* 161 Cal.App.2d 800, 327 P.2d 131 (1958); 80 ALR 2d 360).

the attending physician remains on a case from onset to cure. See *Borgia v. City of New York,* 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962).

We are mindful of the fact that the continuing treatment doctrine has been recognized in many jurisdictions. See Louisell and Williams, *Medical Malpractice,* §§ 13.-06, 13.07, 13.08, 13.09, 13.10 (1985). See also 61 Am.Jur.2d, *Physicians, Surgeons,* etc. § 320, *Effect of Continuing Treatment.* However, neither the doctrine of termination of relationship or the continuous treatment doctrine, as previously defined, are the law in Delaware. In enacting 18 *Del.C.* § 6856, the Delaware legislature could have provided for the tolling of the limitations period until the doctor/patient relationship was terminated or during a continuous course of treatment, whether negligent or not. In fact, the relevant statutes in three states—New York, Michigan and Texas—include such provisions, see *Louisell and Williams, supra.* §§ 13.36, 13.46 and 13.57. Two of these statutes were in effect at the time 18 *Del.C.* § 6856 was enacted. It is reasonable to assume that the Delaware legislature was aware of these alternative approaches to the limitations problems in medical malpractice cases and decided, in its wisdom, not to include such provisions in the Delaware law.

An examination of the cases in which either the termination of relationship doctrine or the continuous treatment doctrine was adopted reveals a judicial effort to soften the harshness of the statutory accrual rule existing in the particular jurisdiction at the time. In Delaware, the legislature has preempted policy making on the subject by enacting 18 *Del.C.* § 6856.[7] There is no reference to the termination of relationship doctrine or the continuous treatment doctrine in the Delaware statute of limitations for medical malpractice actions. As we have previously held:

"We have no alternative but to enforce Section 6856 in accordance with its plain terms despite the somewhat unfortunate result produced. As we have previously stated:

[this Court does not] 'sit as a super legislature to eviscerate proper legislative enactments. If the policy or wisdom of a particular law is questioned as unreasonable or unjust, then only the elected representatives of the people may amend or repeal it. Judges must take the law as they find it, and their personal predilections as to what the law should be have no place in efforts to override properly stated legislative will.' "

*Reyes v. Kent General Hospital, Inc.,* Del. Supr. 487 A.2d 1142 at 1146 (1984).

Since at least 1907, this Court has refused to rewrite clear statues of limitations to provide exceptions. In *Lewis v. Pawnee Bill's Wild West Co.,* Del.Supr., 66 A. 471, 474 (1907), this Court held:

"The courts cannot create exceptions in favor of any class of person, or cases, or in favor of particular cases, when the statute itself makes none, and no hardship which might result from an adherence to this rule can justify a court in departing from it and reading into the statute some qualification which the Legislature did not provide.

Where the Legislature has made no exception to the positive terms of a statute, the presumption is that it intended to make none, and it is not the province of the court to do so."

This rule is repeated in *Hurwitch v. Adams,* 52 Del.Supr. 247, 155 A.2d 591 (1959) and *Layton v. Allen,* Del.Supr., 246 A.2d 794, 798–799 (1968), and was reconfirmed in *Reyes v. Kent General Hospital, Inc.,* Del. Supr., 487 A.2d 1142, 1146 (1984).

7. The Supreme Court in Kansas was confronted with a situation identical to that which we confront herein and also concluded that since the Kansas legislature did not mention either the physician/patient relationship or the continu-

ous treatment as an element in measuring the time in which a cause of action accrues, it was not inclined to do so by judicial legislation. *Hecht v. First National Bank & Trust Company,* 208 Kan. 84, 490 P.2d 649 (1971).

Judicial recognition of the doctrine of termination of relationship or continuing treatment by this Court would result in the same type of expansion of the limitation period that 18 *Del.C.* § 6856 was intended to avoid. It is a settled principle that Courts will not engage in "judicial legislation" where the statute in question is clear and unambiguous. We have previously found the provisions of 18 *Del.C.* § 6856 to be unambiguous. *Reyes v. Kent General Hospital, Inc., supra.* at 1144.

### CONTINUING TREATMENT/PRIOR DELAWARE CASES

Despite the clarity of 18 *Del.C.* § 6856, the Superior Court in this case noted that the continuing treatment doctrine has been recognized in Delaware although no Delaware court has ever affirmatively held that the continuing treatment doctrine applied.[8] This Court has referred to continuing treatment in *Peters v. Nejad,* Del.Supr. 411 A.2d 610 (1979), and again, after remand in *Peters v. Nejad,* Del.Supr. 454 A.2d 765 (1982). The continuing treatment doctrine has also been referred to in a plethora of Superior Court cases.[9] A review of those Superior Court decisions leads to the conclusion that a continuation of medical treatment has been found to be significant only when a course of treatment is so interrelated that there is no proper basis for compartmentalizing the chronology in applying the statute of limitations. See *Streitz v. LeRoy,* Del.Super., C.A. No. 84C–OC–127, Walsh, Justice (April 28, 1986); *Sanchez v. Abdel-Misih,* Del.Super., C.A. 82C–DE–111, Moore, Justice (June 16, 1986) and *Lichtman v. Strauss,* Del.Super., C.A. 85C–JL–43, Stiftel, P.J. (September 23, 1986).[10] Therefore, in fact, what the Delaware courts have recognized is more appropriately described as a cause of action for continuous negligent medical treatment.

### CONTINUOUS NEGLIGENT MEDICAL TREATMENT

Other courts have long recognized that continuing torts do exist and that continuing negligent medical treatment is such a cause of action. Continuing negligent medical treatment has been specifically recognized as a cause of action in Oregon (*Hotelling v. Walther,* 169 Or. 559, 130 P.2d 944 (1942)), Virginia (*Farley v. Goode,* 219 Va. 969, 252 S.E.2d 594 (1979)) and Wisconsin (*Tamminen v. Aetna Cas. & Sur. Co., supra.*). Although the statute of limitations question as resolved herein, is based upon the statute that is unique to Del-

---

8. Final Opinion Below dated May 1, 1986, page 2.

9. See *Collins v. Wilmington Medical Center, Inc.,* Del.Super. 311 A.2d 885 (1973) AFFIRMED Del. Supr. 319 A.2d 107 (1974). *Connell v. Gehret,* Del.Super., C.A. No. 82C–NO–57, Bush, J. (March 2, 1984); *Kisielewski v. Balan,* Del.Super., C.A. No. 82C–JA–86, Stiftel, J. (July 27, 1984); *Williamson v. Gopez,* Del.Super., C.A. No. 83C–DE–23, Taylor, J. (January 10, 1986) [Available on WESTLAW, DE–CS database]; *Longobardi v. Berger,* Del.Super., C.A. No. 83C–MY–69, Gebelein, J. (March 11, 1986) [Available on WESTLAW, DE–CS database]; *Klosowski v. Godwin,* Del.Super., C.A. No. 83C–OC–35, O'Hara, J. (April 3, 1986) [Available on WESTLAW, DE–CS database]; *Streitz v. LeRoy,* Del. Super., C.A. No. 84C–OC–127, Walsh, Justice (April 28, 1986); *Sanchez v. Abdel-Misih,* Del.Super., C.A. 82C–DE–111, Moore, Justice (June 16, 1986); and *Lichtman v. Strauss,* Del.Super., C.A. 85C–JL–43, Stiftel, P.J. (September 23, 1986) [Available on WESTLAW, DE–CS database].

10. The *Lichtman* case is particularly consistent with the recognition today that what the Delaware courts have been recognizing is more appropriately described as a cause of action for continuous negligent medical treatment. In *Lichtman,* both sides conceded that the plaintiff's injuries were immediately discoverable and the two year statute of limitations applied. However, the issue before the Court was not only continuity of treatment but continuous interrelated treatment. President Judge Stiftel concluded that the plaintiff had alleged sufficient facts to show an interrelationship between the surgery of May 2, 1983 and the office visit of July 21, 1983 to make his claim timely. Specifically, President Judge Stiftel held that the two year statute of limitations ran from the last surgically related visit, i.e. the final act in the alleged continuum of negligence that commenced with the surgery.

aware, a review of the underlying cause of action for continuing negligent medical treatment as recognized in these other jurisdictions is instructive.

When there is a continuum of negligent medical care related to *a single condition* occasioned by negligence, the plaintiff has but one cause of action—for continuing negligent medical treatment. If any act of medical negligence within that continuum falls within the period during which suit may be brought, the plaintiff is not obliged to split the cause of action but may bring suit for the consequences of the entire course of conduct. *Tamminen v. Aetna Cas. & Sur. Co., supra.* Cf. *Streitz v. LeRoy, supra.* The crucial question then becomes from what point in time does the statute of limitations begin to run in Delaware when the cause of action is for a continuum of medical negligence?

The proper and appropriate focus for limitation purposes is the last date in the continuum of negligent medical treatment. When the course of action is for continuous negligent medical treatment, the alleged negligent treatment of the patient must be considered as a whole. If the plaintiff is not obliged to split his cause of action, it is just and equitable for the statute of limitations to run from the last date of the interrelated negligent medical treatment. Cf. *Hotelling v. Walther, supra.*

### DELAWARE STATUTE OF LIMITATIONS/CONTINUOUS NEGLIGENT TREATMENT

The construction of a statute of limitations is not the creation of an exception to it in violation of the legislative function. It is the well recognized duty of a court to construe statutes of limitation so as to establish just and reasonable guidelines for different classes of cases in light of the general policy of repose. *Layton v. Allen, supra.* at 799. In Delaware, 18 *Del.C.* § 6856 provides a two-year statute of limitations for injuries discoverable within two years of the injury and a three-year statute of limitations for "inherently

unknowable" injuries. The applicability of the two or three-year time period clearly depends upon when the patient knows or in the exercise of reasonable diligence could have discovered the existence of a cause of action for continuing negligent medical treatment. Cf. 18 *Del.C.* § 6856(1).

In construing the facts and applying the law in any case, the initial focus must be on the Complaint. In Delaware, allegations of negligence must be pled with particularity and should be examined separately for statute of limitations purposes. Cf. *Dunn v. St. Francis Hospital, Inc., supra., Sanchez v. Abdel-Misih, supra., Klosowski v. Godwin, supra., Williams v. Elias,* 140 Neb. 656, 1 N.W.2d 121 (1941), and Superior Court Civil Rule 9(b). The burden of at least *alleging with particularity* a course of continuing negligent medical treatment during a finite period must rest with the plaintiff. To rule otherwise would force each defendant, claiming that the statutory period had run, to demonstrate no involvement in any after-treatment of the plaintiff which might be considered a cause of the plaintiff's injuries. *Sanchez v. Gilberto, supra.* However, the bare allegation by a plaintiff that there has been continuous negligent medical treatment is not enough, in and of itself, to successfully defeat a defendant's Motion for Summary Judgment based upon the statute of limitations. The facts alleged by a plaintiff in support of a cause of action for continuous negligent medical treatment must be examined to see if the negligent treatment, as alleged, can be segmented or is, in fact, so inexorably intertwined that there is but one continuing wrong. *See Streitz v. LeRoy, supra.* and *Klosowski v. Godwin, supra.* If the allegation in a Complaint for continuing negligent medical treatment during a finite period is supported by the facts in the record, the statute of limitations runs from the date of the last act in the negligent continuum. *Oakes v. Gilday,* Del.Super. 351 A.2d 85 (1976); see also *Rankin v. Olmedo,* Del.Super.,

C.A. No. 77C–AU–10, Taylor, J. (August 21, 1979).

A more difficult question is raised by a situation, like the present case, where the patient knows or in the exercise of reasonable diligence could have discovered that a cause of action exists for continuing negligent medical treatment and thereafter permits the physician to treat him anyway. As we observed, persuasive arguments have been made that it is only fair to give a physician an opportunity to take corrective action.[11] However, the Delaware legislature has clearly and unequivocally decided to limit the right to bring a medical malpractice action to a *maximum* of three years. The force of the Delaware legislature's intent is particularly manifest when one realizes that even for a *completely unknown* personal injury, the statute of limitations expires three years after that unknown injury, independent of a plaintiff's ability to have ever ascertained the existence of a cause of action within that three year period.[12]

In *Dunn*, we held that the "date upon which such injury occurred" for the purpose of construing § 6856, was the date of the alleged wrongful act or admission, in determining whether the two-year or the three-year statute of limitations applied.

Today we hold, that when the cause of action is for continuous negligent medical treatment, the "date upon which such injury occurred" is the last act in the negligent medical continuum. Therefore, if a plaintiff has a cause of action for continuous negligent medical treatment and that fact becomes known within two years of an act in the alleged negligent continuum, the statute of limitations begins to run for two years from the last act in the negligent continuum *prior* to the point in time when the plaintiff has actual knowledge of the negligent course of treatment or in the exercise of reasonable diligence could have discovered the negligent course of treatment. To hold otherwise, would permit the patient that has or should have knowledge of a negligent course of medical treatment to extend the statute of limitations by extending the period of treatment after the negligent course of treatment was or should have been known.[13]

We are aware that such a rule limits the health care provider's ability to take corrective action but find that it was the clear intent of the Delaware legislature to have a two-year statute of limitations for known or discoverable wrongs. The patient who continues to be treated by a health care provider after notice (actual or discover-

---

**11.** The cause of action recognized today, for continuous negligent medical treatment, assumes a continuous course of improper examination or treatment which is substantially uninterrupted. It has been argued in other cases that the treatment and the physician/patient relationship should be considered as a whole, and that if there occurred therein malpractice, the statute of limitations should begin to run when the treatment ceased. See *Williams v. Elias*, 140 Neb. 656, 663, 1 N.W.2d 121, 124 (1941), stating that the physician should have all reasonable time and opportunity to correct mistakes that have been made. In effect, the argument would be that when there has been continuous treatment, whether negligent or not, for a condition occasioned by a prior negligent act or treatment, the statute of limitations runs only at the end of the entire course of treatment. This is an argument for the adoption of the continuing treatment rule which has been specifically rejected by the Delaware legislature. Our focus is limited to the last act in the negligent continuum *not* the last act of any treatment.

**12.** The apparent injustice of barring a plaintiff's action before he could have reasonably been aware that he had a claim is patent. However, as we observed in *Dunn*, statutes of limitations are by definition arbitrary and their operation does not discriminate between the just and unjust claim, or *voidable* or unavoidable delay. *Dunn, supra*. The clear language of 18 *Del.C.* § 6856 provides a three-year maximum for medical malpractice actions.

**13.** Other Courts have recognized that a statute of limitations is not tolled by a continuous course of non-negligent treatment following prior negligent treatment. See *Koenig v. Group Health Coop. of Puget Sound*, 5 Wash.App. 836, 491 P.2d 702 (1971). Likewise, the statute of limitations should not be tolled by a continuous course of treatment subsequent to the plaintiff's knowledge or ability to have knowledge of the prior negligent medical treatment.

able) that a prior course of medical treatment was negligent, does so at a double peril. First, the patient may not be cured and second, the statute of limitations is running. In effect, with a patient's permission, a health care provider can have two years to undertake corrective measures. However, when a patient has notice of a cause of action for continuing negligent medical treatment and permits the health care provider to continue treatment thereafter, the patient only has two years to commence a legal action or have it barred. This holding is consistent with and supported by our decision in *Reyes v. Kent General Hospital, Inc., supra.* to the effect that when an inherently unknowable injury becomes known to a plaintiff within the two year period from the alleged date of injury, the plaintiff does not get the additional one year extension provided for in 18 *Del.C.* § 6856(1) but must file an action within two years. *Reyes v. Kent General Hospital, Inc., supra.* at 1145.

▮▮▮ When a plaintiff has a cause of action for continuous negligent medical treatment, it is also entirely possible that like any other cause of action, its viability may be unknown. If a plaintiff has a cause of action for continuous negligent medical treatment and it was unknown to and could not in the exercise of reasonable diligence have been discovered by the injured person, such action must be brought prior to the expiration of three years from the date upon which the last act in the alleged continuum of medical negligence occurred. As we held in *Dunn,* the limited extension of the statute of limitation period in medical malpractice actions from two years to three years is, in our judgment, intended to give consideration to the problem of an injury which is not physically ascertainable. *Dunn, supra.* at 79. However, if, in fact, an injury is ascertainable (physically or otherwise) within two years,

the three-year statute of limitations is inapplicable.

▮▮▮ We are cognizant of the fact that when an allegation is made that a course of medical treatment was negligent, it will be difficult to ascertain whether the negligent course of conduct was "unknown to and could not in the exercise of reasonable diligence have been discovered by the injured person". In determining whether a patient had knowledge of a negligent course of medical treatment which would commence the running of the two year statute, this Court adopts an objective test, i.e. the reasonably prudent person. However, we also hold that there shall be a presumption that a patient who actually consults with an independent health care provider about the same condition which is subsequently the subject matter of an alleged negligent medical continuum knew or in the exercise of reasonable diligence could have known about the prior negligent course of conduct on date of the consultation with the independent health care provider.[14] If a patient receives independent medical advice from a skilled health care provider in the form of a second opinion or consultation, that patient has a duty of inquiry not only about his condition but about his prior course of medical treatment.

In summary we hold: (1) a viable cause of action exists for the ongoing tort known as continuous negligent medical treatment, (2) a continuous course of negligent medical treatment during a finite period must be alleged in a Complaint with particularity, (3) the facts in the record must establish that the treatment was inexorably related so as to constitute one continuing wrong. Absent such an unbroken interrelated chain of events, the applicable statute of limitations will apply to each alleged wrong and not to the course of treatment as a whole, (4) if a continuous course of negligent medical treatment has been alleged

---

**14.** A health care provider will not be deemed independent if he is in a medical group or clinic with the same health care provider who is alleged to have engaged in a continuous course of negligent medical treatment.

*and is supported by the facts* in the record, the statute of limitations runs for two years from the date of last act in the negligent continuum prior to actual knowledge or the point when a reasonably prudent person, in the exercise of reasonable diligence, could have discovered a prior continuous course of negligent medical treatment, (5) there is a presumption that a patient who actually consults with an independent health care provider about the same condition which is subsequently the subject matter of an alleged negligent medical continuum knew or in the exercise of reasonable diligence could have known about the prior negligent course of conduct on the date of the consultation with the *independent* health care provider. In such a situation, the statute of limitations begins to run for two years from the last act in the negligent continuum prior to the point in time when the plaintiff consulted with the independent health care provider, and (6) if the course of negligent medical treatment was not known and could not have been discovered in the exercise of reasonable diligence, the statute of limitations runs for three years from the last treatment in the negligent continuum. In the latter situation, the Complaint must allege and the

facts in the record must support the assertion that the continuing negligent medical treatment was unknown and could not in the exercise of reasonable diligence have been discovered.

## THIS CASE

We must now reconcile the law with the facts in this case. We have held that a cause of action for continuous negligent medical treatment during a finite period of time must be alleged with particularity. The Complaint in this case states that Mr. Ewing was treated by Dr. Beck from October 29, 1974 through September 29, 1980. However, an examination of the separate allegations in the Complaint does not demonstrate the type of interrelationship that can fairly be construed as asserting a continuum of negligent medical treatment.[15] In fact, as the Superior Court observed in its initial opinion, several of the specific allegations, are clearly separable and time barred.[16] Nevertheless, for the purpose of this case only, in all fairness to the plaintiff, we shall assume that, taking the Complaint in its most favorable light, there is a specific allegation that there was continuous negligent medical treatment for blad-

15. From October 29, 1974 to and including the date of his death on November 5, 1980, the said William S. Ewing was exclusively under the care of the defendant herein for any and all medical problems relating to his specialty field which is urology. Sometime after October 29, 1974, and prior to December, 1974, defendant made a diagnosis of carcinoma of the urinary bladder. He actively treated the said William S. Ewing for that condition from that time to and including September 29, 1980. The care afforded the said William S. Ewing failed to accord with acceptable medical standards in the community in the following respects:
   (a) He failed to advise decedent, or his family, of the existence of cancer of the bladder.
   (b) He failed to initiate appropriate treatment for bladder cancer.
   (c) He continued to treat bladder cancer when he was not qualified for such treatment.
   (d) He failed to refer the decedent to a specialist for treatment of cancer. (Complaint, para. 3).

16. The Superior Court held: "Certain remaining issues, however, are ripe for decision. Plaintiff claims that (1) defendant failed to advise Ew-

ing's family of Ewing's bladder cancer; (2) defendant was not qualified to treat Ewing's condition; and (3) defendant failed to refer Ewing to a specialist for the treatment of bladder cancer are unsupported either as a matter of law or fact. Plaintiff presented no legal authority in support of her claim that defendant had a duty to advise Ewing's family of his medical condition and the Court is aware of none. *Cf.* 18 *Del.C.* § 6801(7) (defining "malpractice" as "any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider *to a patient*."). (Emphasis added). Plaintiff's claim that defendant failed to refer Ewing to a specialist for the treatment of bladder cancer necessarily assumes that defendant was not qualified to provide such treatment. The unrefuted facts, however, establish that defendant is so qualified. Accordingly, summary judgment is entered in favor of defendant on these three aspects of plaintiff's claim." (First Opinion, Court Below, May 30, 1985).

der cancer from October 29, 1974 through September 29, 1980.

The plaintiff argues that this continuous course of medical treatment for bladder cancer was negligent, unknown and could not in the exercise of reasonable diligence have been discovered. Therefore, the plaintiff contends that the statute of limitations starts to run two years from the last act in what we are assuming she asserts is the alleged negligent continuum, i.e., from September 29, 1980. However, the plaintiff admits that in the spring and summer of 1979, the fact was known to her and her husband that there was cancer in his prostate gland. If the cancer was no longer confined to the bladder because the prior course of medical treatment for bladder cancer had been negligent, that fact was discernable by a reasonably prudent patient in 1979, when the failure to have successfully contained the cancer became known to both Mr. and Mrs. Ewing.

On July 16, 1979, at the request of Dr. Beck, Mr. Ewing alone consulted with Dr. Carlo A. Cuccia, a specialist, for radiation therapy. Dr. Cuccia testified that he told Mr. Ewing that the cancer of the bladder had spread into his prostate gland. Dr. Cuccia was an independent health care provider. We have held that there is a presumption of knowledge about a prior course of treatment that is subsequently alleged to have been negligent when one has the opportunity to consult with an independent health care provider. Dr. Cuccia is insistent that he was not treating Mr. Ewing only for cancer of the prostate, but was also treating cancer of the bladder that had spread into the prostate. Assuming, arguendo, that Dr. Cuccia did not make this fact known to Mr. Ewing, on July 16, 1979, Mr. Ewing had the *opportunity to ask* Dr.

Cuccia, an independent health care provider, how he came to have prostate cancer and to find out if the cancer in the prostate gland was a new cancer or related to the previous bladder cancer. On July 16, 1979, Mr. Ewing had actual knowledge [17] from Dr. Cuccia of the fact that the cancer of his bladder had spread into his prostate *or in the exercise of reasonable diligence could have discovered that fact* by asking Dr. Cuccia the questions which Dr. Cuccia testified were, in fact, asked and answered.

The statute of limitations for an allegation of continuous negligent medical treatment for bladder cancer against Dr. Beck begins to run two years from the last act in the negligent continuum prior to the point in time when Mr. Ewing had an actual knowledge of the prior negligent course of treatment or in the exercise of reasonable diligence could have discovered the negligent course of treatment from Dr. Cuccia. Since Mr. Ewing acquired or had the opportunity to acquire that knowledge on July 16, 1979, and since Mr. Ewing's last visit with Dr. Beck prior to that for the treatment of bladder cancer was on July 10, 1979, the two year statute of limitations began to run on July 10, 1979.

After Mr. Ewing consulted with Dr. Cuccia on July 16, 1979, he assumed the double risk not only that Dr. Beck could not control the cancerous condition of his bladder that had already extended into the prostate gland, but that the statute of limitations would be running. The Delaware law does not permit Mr. Ewing to toll the beginning of the running of the statute of limitations until September 29, 1980, by permitting Dr. Beck to continue to treat him after Mr. Ewing knew or in the exercise of reasonable diligence could have known that the prior course of medical treatment had been negligent.[18] When the facts are considered

---

**17.** The testimony of Dr. Cuccia, that he informed Mr. Ewing on July 16, 1979 that his cancer had spread and that his condition was serious, is undisputed. Since Mr. Ewing had actual knowledge of his condition on July 16, 1979, an application of the presumption which the Court recognizes after an independent medi-

cal consultation is unnecessary for the purpose of deciding this case.

**18.** For the purpose of considering the plaintiff's claims in this case, it has been assumed that there was, in fact, a continuous course of negligent medical treatment from October 29, 1974 through July 10, 1979. However, that assump-

in the light most favorable to the plaintiff, as is required here on Summary Judgment, *Hazewski v. Jackson,* Del.Super., 266 A.2d 885, 886 (1970), it becomes clear that Mr. Ewing knew or in the exercise of reasonable diligence could have discovered his rights on July 16, 1979. The failure to exercise this due diligence and/or in continuing to be treated by Dr. Beck, despite actual knowledge, resulted in the running of the statute of limitations. *Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983). Therefore, the Complaint filed by Anne Y. Ewing on August 5, 1982, is time barred.

For the reasons we have previously stated, the consultation between Dr. Cuccia and Mr. Ewing on July 16, 1979 was sufficient to commence the running of the two-year statute of limitations on July 10, 1979. However, it is also noted that on June 9, 1980, Mr. Ewing called the office of Dr. Beck and asked that his next hospitalization be scheduled for the following two weeks. Mr. Ewing also told Dr. Beck's nurse that pursuant to *his own request,* another urologist, Dr. Guecho, would check his condition to provide a *second opinion.* That hospitalization began on June 29, 1980 and ended on June 30, 1980. Various operative procedures were performed including a cystoscopy and biopsy of the bladder wall. Dr. Cuccia consulted on the cystoscopy and actually performed the biopsies himself. Therefore, Mr. Ewing not only consulted with but was actually treated by a second independent health care provider almost one year prior to what we have deemed to be the expiration of the approriate statute of limitations. Mr. Ewing's discharge diagnosis as result of the June 30, 1980 hospitalization, includes a reference to carcinoma of the bladder. By an exercise of due diligence and reasonable inquiry with the *second independent health care provider,* Mr. Ewing did or could have discovered his possible cause of action against Dr. Beck. After Mr. Ewing requested a second opinion and was treated by the independent urologist of his choice

(Dr. Guecho, on June 30, 1980) he continued to permit Dr. Beck to treat him for another entire year without filing a law suit. Mrs. Ewing did not file this law suit for almost one additional year after her husband's death and the consultation at Johns Hopkins.

While we find that the visit with Dr. Cuccia is the controlling date for commencing the running of the statute of limitations on July 10, 1979, it should be noted that if the June 30, 1980 date was the first time that Mr. Ewing received or had the opportunity to receive independent medical advice, under our analysis, timely litigation would have had to have been commenced within two years of the last visit with Dr. Beck prior to June 30, 1980. Therefore, the August 5, 1982 suit would still be time barred.

*FRAUDULENT CONCEALMENT*

█ Finally, the plaintiff alleges that the doctrine of fraudulent concealment requires a decision in her favor with regard to the statute of limitations. When a plaintiff wishes to rely on the doctrine of fraudulent concealment, a prerequisite is for the Complaint to allege that the health care provider had actual knowledge of the wrong done and acted affirmatively in concealing the facts from the patient. *Shockley v. Dyer, supra.* at 799. The Complaint in this case does not make these specific allegations. Again, in fairness to the plaintiff, we will consider this claim. It has been briefed and argued.

█ Where there has been fraudulent concealment from a patient, the statute of limitations is suspended only until the patient's rights are discovered or until they could have been discovered by the exercise of reasonable diligence. *Halpern v. Barran,* Del.Ch., 313 A.2d 139 (1973), *Layton v. Allen, supra.* at 799, *Dyer v. Shockley, supra.* at 799. We have found that Mr. Ewing knew or by the exercise of

tion is made *arguendo* only for the purpose of considering the plaintiff's claim in this case and

is not supported in the record by any medical testimony.

reasonable diligence could have discovered his rights from Dr. Cuccia on July 16, 1979 or from Dr. Guecho on June 30, 1980. The record does not support the allegation that Mr. Ewing's condition was concealed from him or that he was put off any course of inquiry. Under the rule in *Shockley v. Dyer, supra.*, once a patient is put on notice of facts concerning his condition which would lead to the truth, the patient can no longer rely on subjective ignorance of the situation. The record does not support the allegation of fraudulent concealment. However, the record does indicate that concealment of Mr. Ewing's condition, if any, ended on July 16, 1979 or June 30, 1980. There is no justification for applying the doctrine of fraudulent concealment in this case. However, the Complaint which was filed on August 5, 1982, more than three years after any concealment ended, would not be saved by its application.

For the reasons stated herein, the decision of the Superior Court granting Summary Judgment in favor of the defendant is AFFIRMED.