**Cynthia GRECO, Plaintiff Below, Appellant,**

v.

**The UNIVERSITY OF DELAWARE, a Delaware corporation, the University of Delaware Student Health Center, an unincorporated association, and Dr. Lori Talbot, Defendants Below, Appellees.**

Supreme Court of Delaware.

Submitted: Oct. 20, 1992.

Decided: Jan. 8, 1993.

Rachel B. Mersky of Walsh and Monzack, Wilmington, for appellant.

F. Alton Tybout of Tybout, Redfearn & Pell, Wilmington, for appellees.

Before MOORE, WALSH and HOLLAND, Justices.

HOLLAND, Justice.

The plaintiff-appellant, Cynthia Greco ("Greco"), filed a civil action in the Superior Court on December 20, 1989 against the defendants-appellees, the University of Delaware, ("the University"), the University of Delaware Student Health Center ("the Student Health Center")[1] and Lori Talbot, M.D. ("Dr. Talbot"). Each defendants' answer to Greco's complaint denied negligence and asserted the affirmative defense of the statute of limitations. Following discovery, the defendants filed motions for summary judgment based upon the defense of the statute of limitations. The Superior Court granted each of the defendants' motions.

In this direct appeal, Greco has raised two contentions. First, she contends that all of the defendants are subject to the general personal injury statute of limitations set forth in 10 *Del.C.* § 8119, and not the specific statute of limitations prescribed by the Medical Practice Act, 18 *Del.C.* § 6856. Second, Greco contends that, if Section 8119 is the applicable statute of limitations, it does not begin to run until after a personal injury is physically manifest, which Greco asserts in her case was some time on or after December 20, 1987. We have concluded that neither of Greco's positions is meritorious. Therefore, the judgments of the Superior Court are affirmed.

---

1. Apparently, the Student Health Center is not a separate entity, but is a part of the University of Delaware.

*Facts*

Greco was enrolled as a full-time undergraduate student at the University during the Fall term of 1987. The University requires all full-time undergraduate students to pay a health fee as part of their tuition. That fee helps the University to defray the cost of maintaining the Student Health Center. The Student Health Center provides the University's students with a wide range of primary care medical treatment.

Greco went to the Student Health Center on September 16, 1987. While there, she obtained a prescription for Nordette 28, an oral contraceptive in tablet form. Pursuant to the instructions provided by the physician at the Student Health Center who prescribed the oral contraceptive, Greco began taking the pills on October 11, 1987. On October 23 and November 24, 1987, Greco called the Student Health Center and complained of problems which she related to the pills. On December 1, 1987, Greco went to the Gynecological Department of the Student Health Center and complained that she was ill.

On December 4, 1987, Greco was examined for the first time by Dr. Talbot, a full-time physician employed by the University at the Student Health Center. Greco informed Dr. Talbot that she was experiencing twitching, numbness, blue spots under her skin, thickness of tongue, vomiting, nausea and dizziness. At that time, Greco also told Dr. Talbot that the only medication she was taking was an oral contraceptive. Dr. Talbot noted all of this information in Greco's medical record. Dr. Talbot did not tell Greco to stop taking the oral contraceptive nor did she advise Greco of a possible relationship between her symptoms and the birth control pills.

After some initial tests, Greco returned to Dr. Talbot's office on December 8, 1987. Greco was re-examined on that date. Her symptoms had not changed. When Dr. Talbot asked Greco whether she was taking any medications, Greco again advised Dr.

Talbot that she was only taking an oral contraceptive. Dr. Talbot concluded that additional evaluation was necessary and ordered further laboratory tests.[2]

Greco was advised by Dr. Talbot that, although something was wrong, Dr. Talbot could not determine the cause of Greco's physical symptoms. Dr. Talbot also advised Greco to see a neurologist. In her deposition testimony, Greco acknowledges that, when Dr. Talbot advised her to consult a neurologist, she did not follow up on that recommendation in Delaware because she knew she would soon be seeing a doctor near her home in New Jersey. Greco's amended complaint asserts that the last care rendered to Greco by Dr. Talbot, the University and the Student Health Center occurred on December 8, 1987.

On or about December 9, 1987, Greco completed the Fall semester at the University and went home for its Winter break. Greco consulted Dr. Arnold DiBella ("Dr. DiBella"), a physician near her home in New Jersey on December 10, 1987. Dr. DiBella referred Greco to his associate. Greco also consulted a neurologist, Dr. Shenka. The neurologist prescribed an anti-seizure medication for Greco. Greco's contacts with these physicians in New Jersey all occurred between December 10 and December 15, 1987.

Greco's symptoms apparently remained consistent but did not worsen until late in the evening on December 20, 1987. On that date, Greco's condition deteriorated substantially while she was on a trip in Pennsylvania. Greco doubled over in pain caused by cramps, became extremely hot, and experienced other acute medical symptoms. Greco was taken to a hospital by ambulance. On December 21, 1987, while in the hospital, Greco experienced a grand mal seizure. She was operated on immediately for a mesenteric vein thrombosis.

On or about December 22, 1987, Greco was transported by helicopter to the University of Pennsylvania Hospital for additional surgery and treatment. Greco was

hospitalized there for a period of approximately five weeks. During Greco's hospitalization, about sixteen feet of her intestines were removed. A number of studies were also done, pursuant to the direction of her principal physician, Dr. Gary Crooks ("Dr. Crooks"), to try to ascertain the cause of Greco's medical problems.

Dr. Crooks was deposed as part of the discovery in this proceeding. Prior to that deposition, Dr. Crooks had examined the Student Health Center records. Dr. Crooks concluded that all of the symptoms for which Greco had consulted Dr. Talbot were caused by the oral contraceptive. In Dr. Crooks' opinion, it was medical negligence for Dr. Talbot not to advise Greco to cease taking the oral contraceptive when Greco presented herself to Dr. Talbot at the Student Health Center on December 4, 1987. Dr. Crooks also opined that if Greco had stopped taking the oral contraceptives on December 4, 1987, she would not have sustained the mesenteric vein thrombosis on December 20, 1987.

### Medical Malpractice Statute of Limitations Respondeat Superior

Greco has always acknowledged that, if the medical malpractice statute of limitations is applicable to any of her claims for negligence, those claims are time barred. 18 Del.C. § 6856. See Ewing v. Beck, Del. Supr., 520 A.2d 653 (1987). During oral argument in this Court, Greco's attorney acknowledged that all of Greco's claims against Dr. Talbot are governed by the medical malpractice statute of limitations and, accordingly, are time barred. Therefore, the entry of judgment in favor of Dr. Talbot by the Superior Court is no longer a contested issue in this appeal.

Nevertheless, Greco argues that the time bar of the medical malpractice statute of limitations has no bearing upon her claims for negligence against Dr. Talbot's employers, the University and the Student Health Center. In support of that position, Greco

---

**2.** The record reflects that Dr. Talbot received the results of some of these tests on December 9, 1987 and December 10, 1987.

relies upon this Court's holding in *Cole v. League for Planned Parenthood,* Del. Supr., 530 A.2d 1119 (1987). We have concluded that Greco's reliance upon *Cole* is misplaced.

In *Cole,* this Court recognized that the medical malpractice statute of limitations only applies to a defined group of health care providers. *Cole v. League for Planned Parenthood,* 530 A.2d at 1122. Those "health care providers" are defined in 18 *Del.C.* § 6801(5). That definition requires such an entity or person to be licensed by the State to provide "health care or professional services" pursuant to either Title 16 or Title 24.

The record reflects that neither the University nor the Student Health Center are licensed health care providers. According to Greco, *ipso facto,* the medical malpractice statute of limitations is irrelevant to *any* of her claims against those defendants. Greco also relies upon this Court's statement in *Cole* that the medical malpractice statute of limitations "was intended by the General Assembly to afford protection exclusively for those professionals in direct personal contact with the patient." *Cole v. League of Planned Parenthood,* 530 A.2d at 1123.

In *Cole,* the employer-defendant was the Delaware League for Planned Parenthood (DLPP). In· *Cole,* the plaintiff's vicarious claim against DLPP, pursuant to the theory of *respondeat superior,* was for negligent counseling, based upon legal principles set forth in the RESTATEMENT (SECOND) OF TORTS § 323. *Id.* at 1121. The record, in *Cole,* reflected that· "the employee of DLPP from whom the plaintiff sought counselling for her pregnancy was neither a nurse nor a physician." *Cole v. League for Planned Parenthood,* 530 A.2d at 1122. Thus, "neither DLPP nor the counselor in question was [a] ... licensed· health care provider." *Id.* Consequently, in *Cole,* this Court held that the medical malpractice statute of limitations was inapplicable to a claim for vicarious negligence, on the theory of *respondeat superior,* against an employer (DLPP), when *neither* the employer nor the employee was a licensed health care provider. *Id.*

The facts in Greco's case are distinguishable from the facts in *Cole.* In Greco's case, all of Greco's *vicarious* claims against the University and the Student Health Center are, based upon the theory of *respondeat superior,* attributed to them by Greco because of Dr. Talbot's status as their employee. Dr. Talbot is a licensed health care provider. Accordingly, even Greco now acknowledges that the medical malpractice statute of limitations controls and bars Greco's untimely claims which allege Dr. Talbot's professional negligence.

■ Generally, a viable cause of action against the employee for negligence is a condition precedent to imputing vicarious liability for such negligence to the employer pursuant to the theory of *respondeat superior.* 2 *Mechem on Agency* § 2012, pp. 1581–82 (1914). *See* RESTATEMENT (SECOND) AGENCY § 217B(2) (1958) and its comments. Therefore, where the alleged basis for the liability of an employer is the negligence of an employee, "the employer cannot be held liable unless the employee is shown to be liable." *Clark v. Brooks,* Del.Super., 377 A.2d 365, 371 (1977). 2 *Mechem on Agency* § 2012. Hence, generally, "if absence of culpability on the part of the employee to the injured person has been established by litigation, the employer cannot be held liable to the injured person." *Clark v. Brooks,* 377 A.2d at 371. *But see* inter-spousal immunity exception in *Fields v. Synthetic Ropes, Inc.,* Del.Supr., 215 A.2d 427 (1967).

■ Accordingly, in an action for medical malpractice, this Court has held that the alleged negligence of an employee, who is a health care provider, must be the focus of any inquiry into the vicarious liability of the employer of that health care provider under the doctrine of *respondeat superior. Reyes v. Kent General Hospital, Inc.,* Del. Supr., 487 A.2d 1142, 1144 (1984). If an employee, who is a licensed health care provider, is not liable to the plaintiff for medical negligence, neither is the employer. *Id.* Consequently, the alleged negligence of Dr. Talbot must be the focus of our

inquiry into Greco's claims against the University and the Student Health Care Center, which allege their vicarious liability under the doctrine of *respondeat superior.* *Id.*

In this case, Greco's claims for medical negligence against Dr. Talbot are acknowledged by Greco to be barred by the medical malpractice statute of limitations. 18 *Del.C.* § 6856. Since Dr. Talbot (the employee) is not liable to Greco on the merits, because Greco's claims are barred by the medical malpractice statute of limitations, there is no vicarious liability to be imputed to Dr. Talbot's employers, the University and the Student Health Care Center. *A fortiori,* the two-year time limitation in the medical malpractice statute, which admittedly bars Greco's claims against Dr. Talbot, accrues to the benefit of her employers. The result of the time bar to Greco's claim for medical negligence against Dr. Talbot is a failure of Greco's vicarious claims on the theory of *respondeat superior* against Dr. Talbot's employers, the University and the Student Health Center. *Id.; Reyes v. Kent General Hospital, Inc.,* 487 A.2d at 1144; 2 *Mechem on Agency* § 2012.[3]

### Personal Injury Generally Statute of Limitations Employer Direct Liability

We have concluded that Greco's vicarious claims against the University and the Student Health Center, based upon the theory of *respondeat superior,* are time barred. Nevertheless, as a general rule, if there is an independent basis for finding the principal liable, judgment can be entered against the principal even if judgment is entered in favor of the agent. *See* RESTATEMENT (SECOND) AGENCY § 217B Comment (d) (1958). Greco contends that even if her vicarious claims, which sought to impute Dr. Talbot's alleged medical negligence to the University and the Student Health Care Center, are time barred, her complaint alleges timely claims of direct and independent negligence by the University and the Student Health Center.[4]

The parties agree that the statute of limitations which controls Greco's non-vicarious claims of direct and independent negligence against the University and the Student Health Center are governed by the statute of limitations which generally applies to personal injury actions. 10 *Del.C.* § 8119. That general statute of limitations for personal injuries provides that "[n]o action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of 2 years from the date upon which it is claimed that such alleged injuries were sustained...." *Id.* Accordingly, the question which must be answered, to determine the operative date of the time bar in that statute of limitations, is: upon which date did the statute begin to run, i.e., when was the personal injury "sustained"?

Greco has acknowledged that her claims of negligence against Dr. Talbot are barred by the medical malpractice statute of limitations (18 *Del.C.* § 6856), because that statute's two-year time period began to run on December 8, 1987, the date of Greco's last visit with Dr. Talbot prior to consulting an independent health care provider on December 10, 1987. *See Ewing v. Beck,* Del. Supr., 520 A.2d 653, 664–65 (1987). However, Greco argues that the general statute of limitations for personal injuries did not begin to run in her case until at least December 20, 1987. 10 *Del.C.* § 8119. Greco's argument is premised upon her contention that her injury was "inherently unknowable" until the mesenteric vein thrombosis occurred on that date.

The seminal decision by this Court on delayed manifestation of personal injuries

---

3. *Accord Wilhelm v. Traynor,* Fla 5th DCA, 434 So.2d 1011, 1013 (1983) (review denied, Fla. Supr., 444 So.2d 418 (1984)).

4. For the purpose of deciding the merits of Greco's contentions pursuant to Section 8119, this Court, like the Superior Court, will assume that Greco's complaint does allege direct claims for negligence against the University and the Student Health Center, i.e., independent of any theory of vicarious liability, pursuant to the theory of *respondeat superior,* because of the alleged negligence of their employee, Dr. Talbot.

is *Layton v. Allen*, Del.Supr., 246 A.2d 794 (1968). In *Layton*, this Court held:

[u]pon the basis of reason and justice ... the injury is "sustained" under § 8118 [now § 8119] when the harmful effect first manifests itself and becomes physically ascertainable. Translated in the terms of this case, we hold that the limitations period commenced to run when the plaintiff first experienced pain caused by the unknown foreign object.

*Layton v. Allen*, 246 A.2d at 798.

Greco cites *Layton* in support of her contention that the Section 8119 statute of limitations began to run after her mesenteric vein thrombosis on December 20, 1987. According to Greco, the direct negligence by the University and the Student Health Center resulted in a "failure of diagnosis" by Dr. Talbot. Greco asserts that Dr. Talbot's "failure of diagnosis" was unknown to her until her personal injury became "manifest" on December 20, 1987 and a correct diagnosis was subsequently made by Dr. Crooks.

The question of when a personal injury is "sustained" in the context of an alleged "failure to diagnose" has been definitively answered by this Court, when it applied the construction of Section 8119 set forth in *Layton* to a medical malpractice claim. *Collins v. Wilmington Medical Center, Inc.*, Del.Supr., 319 A.2d 107 (1974).[5] The sequence of events in *Collins* was virtually identical to the sequence of events in Greco's case:

In *Collins*, the defendant-physician advised the plaintiff that he could not provide the proper relief and recommended that a neurosurgeon be consulted. This Court assumed, without deciding, that Collins' relationship with the defendant-doctor ended on December 9, 1970. *Collins v. Wilmington Medical Center, Inc.* 319 A.2d at 108.

In Greco's case, on December 8, 1987, Greco was advised that defendant, Dr. Talbot, could not provide the necessary relief and was advised to see a neurolo-

gist. This was Greco's last contact with either the University or the Student Health Center.

In *Collins*, the plaintiff saw a neurosurgeon on December 9, 1970. *Collins v. Wilmington Medical Center, Inc.*, 319 A.2d at 108.

In Greco's case, between December 10 and 15, 1987, Greco saw several independent physicians, including a neurologist.

In *Collins*, the plaintiff filed suit on December 18, 1972. This was 2 years and 9 days after the day her relationship with the defendant-physician was assumed to have ended. *Collins v. Wilmington Medical Center, Inc.*, 319 A.2d at 108.

In Greco's case, the suit was filed on December 20, 1989. This was 2 years and 12 days after her last visit to Dr. Talbot.

Greco argues that the two-year statute of limitations in Section 8119 began to run on December 20, 1987 because it was the date when the mesenteric vein thrombosis occurred, which was subsequently attributed by Dr. Crooks to the oral contraceptive that Greco had been taking. However, in *Collins*, this Court specifically rejected the concept that the Section 8119 statute of limitations would not begin to run until a diagnosis was made.

[C]ommencement of the running of the statute does not depend on when a diagnosis is made or a "cure" effected. If it did, the statute would never start in some cases. The statute starts, rather, when a harmful effect first manifests itself and becomes physically ascertainable. In short, manifestation of the problem, not its cure, is the test under *Layton*.

*Collins v. Wilmington Medical Center, Inc.*, 319 A.2d at 108. *Accord Kaufman v. C.L. McCabe & Sons, Inc.*, Del.Supr., 603 A.2d 831, 834 (1992).

In *Collins*, the plaintiff experienced symptoms for which the defendant doctor could not provide relief. He referred Col-

---

5. The general personal injury statute of limitations (10 *Del.C.* § 8119) was applied in *Collins* because that litigation took place prior to the enactment of the medical malpractice statute of limitations (18 *Del.C.* § 6856).

lins to a neurosurgeon. Collins saw the neurosurgeon on December 9, 1970. Collins' relationship with the defendant-doctor was assumed, but not decided, to have ended on December 9, 1970.[6] The complaint was filed on December 18, 1972. In affirming the bar of the statute of limitations in 10 *Del.C.* § 8119, this Court held:

> Given the pain she was experiencing and her doctor's inability to provide relief, plaintiff did not have the inherently unknowable injury found in *Layton.* On the contrary, by December 9, 1970 if not prior thereto, plaintiff was on notice something was wrong. And, under *Layton,* the limitation period commenced to run at least by that time.

*Collins v. Wilmington Medical Center, Inc.,* 319 A.2d at 108.

Similarly, in this case, Greco was on notice by at least December 8, 1987, if not prior thereto, that something was wrong. Greco also knew that Dr. Talbot could not provide her with relief for the symptoms she was experiencing. Therefore, the complaint which Greco filed on December 20, 1989 would be time barred by 10 *Del.C.* § 8119, pursuant to the holding and *ratio decidendi* in *Collins. Id.*

Nevertheless, Greco argues that this Court changed its construction of Section 8119, as set forth in *Layton* and *Collins,* by its decision in *Cole v. League for Planned Parenthood,* Del.Supr., 530 A.2d 1119 (1987). Greco's position is premised upon a single sentence in *Cole,* which Greco has read without regard to the context of the procedural posture and the facts which were presented to this Court, wherein we stated our *disagreement* with the Superior Court's rationale.[7] Greco also disregards the fact that, since *Cole* was decided by a panel of three Justices, it could not overrule any prior precedent of this Court. Supr.Ct.R. 4.

Moreover, in *Cole,* this Court's specific reliance upon *Layton* and *Collins* demonstrates that there was no intention to alter the well-established rule that the general statute of limitations for a personal injury action, Section 8119, begins to run when the harmful effect of the alleged negligence "first manifests itself and becomes physically ascertainable:"

> Under the time of discovery rule of *Layton v. Allen,* Del.Supr., 246 A.2d 794 (1968), and its progeny, an inherently unknowable injury is discoverable for purposes of setting in motion the time limitation of section 8119 when the harmful effect of an otherwise unknowable injury "first manifests itself and becomes physically ascertainable." *Collins v. Wilmington Medical Center, Inc.,* Del. Supr., 319 A.2d 107, 109 (1974). For the statute of limitations to begin to run, plaintiff is not required to have knowledge of a causal relationship between the initial injury and the defendants' tortious conduct.

*Cole v. League for Planned Parenthood,* 530 A.2d at 1124.

Therefore, even if Greco's complaint alleged direct and independent negligence by the University and the Student Health Center, her personal injury was manifest and physically ascertainable when she reported her symptoms to Dr. Talbot on December 8, 1987, if not before. Greco's complaint alleges that her last contact with the University and the Student Health Center was via Dr. Talbot on December 8, 1987. Consequently, assuming *arguendo* that it alleged direct and independent acts of negligence by the University and the Student Health Center, the personal injury complaint which Greco filed on December 20, 1989 was untimely. 10 *Del.C.* § 8119. *Cole v. League for Planned Parenthood,* Del.Supr., 530 A.2d 1119 (1987); *Collins v.*

---

6. This Court subsequently determined that Delaware's General Assembly expressly rejected the doctrine of termination of relationship or continuing treatment with the enactment of 18 *Del.C.* § 6856. *Ewing v. Beck,* 520 A.2d at 659–661.

7. The sentence in *Cole* which Greco has taken out of context reads "[t]he statute is not tolled until such time as plaintiff acquires knowledge of a causal relationship between the physical manifestation of injury and a given defendant's conduct, as Superior Court ruled." *Cole v. League for Planned Parenthood,* 530 A.2d at 1124.

*Wilmington Medical Center, Inc.,* 319 A.2d at 108; *Layton v. Allen,* Del.Supr., 246 A.2d 794 (1968).

### Conclusion

The judgments of the Superior Court, entered in favor of each defendant, are AFFIRMED.