**Ben CARR, Plaintiff,**

v.

**TOWN OF DEWEY BEACH, an incorporated municipality of the State of Delaware, and Samuel Fader, in his individual capacity and his official capacity as Building Inspector of the Town of Dewey Beach, Defendants.**

**Civ. A. No. 87–632 MMS.**

United States District Court,
D. Delaware.

Feb. 2, 1990.

Barry M. Willoughby, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiff.

N. Maxson Terry, Jr., of Terry, Jackson, Terry & Wright, Dover, Del., for defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This is defendants' motion for summary judgment. On December 7, 1987 plaintiff Ben Carr filed a complaint against defendants Town of Dewey Beach ("Dewey Beach" or "the Town") and its Building Inspector Samuel Fader in his official and individual capacities based upon what plain-

tiff characterizes as "a series of events surrounding defendants' bad faith efforts to impede [plaintiff's] development of a commercial property in Dewey Beach...." Plaintiff's Answering Brief, *Carr v. Town of Dewey Beach*, C.A. No. 87–632 MMS at 2 (Docket No. 16) (hereinafter "Dkt. ___).

The complaint alleges two counts. Count I describes a cause of action under 42 U.S.C. § 1983, alleging violation of plaintiff's rights of substantive and procedural due process, equal protection, and privileges and immunities of state citizenship. Count II alleges various state law claims, including claims for malicious prosecution, false arrest, intentional infliction of emotional harm, abuse of judicial process and violation of article I, sections 6 and 7 of the Delaware Constitution. This court has jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1332.

Defendants have moved for summary judgment. They assert three arguments: (1) Claims in both counts based upon events occurring prior to December 7, 1985 are barred by the applicable statute of limitations; (2) Defendant Dewey Beach is entitled to summary judgment on the section 1983 claim against it under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and subsequent case law determining the scope of municipal liability under section 1983; and (3) Both defendants are entitled to summary judgment on the merits on the section 1983 claims. For the reasons set forth in this opinion, defendants' motion will be granted in part and denied in part.

## THE FACTS

The events leading to this case are not disputed. The parties' interpretation of those events, however, is hotly contested.

Plaintiff Carr is a Maryland citizen and an architect by profession. In 1974, he purchased a lot in Dewey Beach on the corner of Route 1 and North Van Dyke Street ("Van Dyke"). On May 5, 1983 Carr sought a building permit to add an extension to an existing building on the lot. Appendix to Defendant's Opening Brief, *Carr v. Town of Dewey Beach*, C.A. No. 87–632 MMS at 104–108 (Dkt. 28A) (cited hereinafter as "DA-___"); Appendix to Plaintiff's Answering Brief, *Carr v. Town of Dewey Beach*, C.A. No. 87–632 MMS at 112–14 (Dkt. 16A) (cited hereinafter as "PA-___"). He submitted plans which contemplated construction within six feet of the property line bounded by Van Dyke.

Defendant Fader was at all relevant times the Building Inspector for defendant Town of Dewey Beach. On May 8, 1983 Fader responded to Carr's application by a letter enumerating several "concerns." DA–114; PA–104. Among his concerns was the fact that Carr's plans called for building within six feet of Van Dyke. Dewey Beach ordinances required a six-foot set back from the front of the property. According to Fader's letter, the Town's longstanding practice of treating side streets as front streets for set back purposes required a six-foot set back from Van Dyke as well as Route 1. This practice was not explicit in the Town's ordinances. Fader was also concerned because the plan called for parking on the corner of Route 1 and Van Dyke in violation of corner visibility regulations.[1]

Carr responded by letter dated May 10, 1983. DA–120; PA–119. Fader denied the building permit in a letter dated May 13, 1983.[2] DA–110; PA–125. He supplemented the denial by handwritten letter dated June 7, 1983, setting forth specific reasons for the denial.[3] DA–111; Pa–134.

1. The other concerns involved updating a DOT permit, the height of a fire tower and the location of a storage room building. These are not at issue in this case.

2. On May 23, 1983 Carr received permit No. 141 to build that part of his proposal not in dispute. *See* DA–109; PA–133. He later received permit No. 233 on March 12, 1984 for construction of a "Store and Apartment" on the same land. Exh.

A, Stipulation of the Parties (Dkt. 39). The plans incorporated in permits 141 and 233 presumably abided by the Town's set back policy and called for no construction within six feet of Van Dyke.

3. The only reason for denial that is of concern in this case is Fader's assertion that the plans violated the set back requirement from Van Dyke. The defendants characterize this letter as

Carr appealed the denial to the Town's Board of Adjustment ("Board"). Prior to the hearing, Fader submitted to the Board a memorandum summarizing his position. PA–138–45. Plaintiff characterizes this memorandum as prejudicial. He also claims the memo was submitted without his knowledge. Defendants respond that it is common practice for the Building Inspector to furnish the Board with a summary of the controversy and that copies were available to the plaintiff and to the public.

During the hearing, the defendants raised, apparently for the first time, the expiration of Carr's license to practice architecture in Delaware. Plaintiff characterizes defendants' action as adding new objections and requirements to the issuance of his building permit. Defendants point out that the license was in fact expired. The Board upheld the denial—including, as grounds for denial, the set back requirement and the problem with parking on the corner. DA–136–142; PA–148–154.

Carr appealed the Board's decision to the Delaware Superior Court in September 1983. In November 1983 the Town passed an ordinance legislating the practice of treating side streets as "front" for set back purposes. Plaintiff says the ordinance was passed in response to his appeal. Defendants state the Town merely wanted to correct what had turned out to be a flaw in the zoning code.

Plaintiff alleges the Town initially failed to provide him with the tapes from the Board of Adjustment hearing for use in his appeal to the Superior Court and that when he pressed defendants, *see* PA–180 (letter from Carr's attorney requesting the tapes), a stop work order was issued against him in retaliation on December 8, 1983. DA–123; PA–178. Defendants contend the tapes were merely misplaced and that they were later found and transcribed for plaintiff. The December 8, 1983 stop work order alleged that Carr was building in the set back area in contravention of both permit No. 141 obtained by Carr on May 28, 1983 and the August 17, 1983 decision of the Board. PA–167. The following day, December 9, 1983, the Mayor of Dewey Beach caused a summons to be issued charging Carr with building without a valid building permit. DA–124; PA–170. The summons was nolle prossed at the request of the Town Solicitor on January 6, 1984. DA–127; PA–179. Defendants claim the Town Solicitor withdrew the summons when Carr's attorney convinced him that the structures in the set back area were only temporary. They also note that plaintiff was never arrested or required to appear in court and that he received no adverse publicity from the issuance of the summons. The Town Solicitor advised Carr that the stop work order was revoked on February 8, 1984. PA–181. Defendants contended at oral argument that plaintiff was aware the stop work order had been dismissed as early as January 20, 1984.

The Delaware Superior Court reversed the decision of the Board of Adjustment on September 6, 1984 as to both the set back and the parking area issues. *See Carr v. Board of Adjustment of the Town of Dewey Beach*, C.A. No. 83A–SE3 (Del.Super. Sept. 6, 1984) (Tease, J.). On September 10, 1984, the Town Solicitor notified Carr's attorney that, in accordance with the Superior Court decision, Carr would be allowed to amend his current permit (No. 233) to extend construction into the set back area. Exh. D, Stipulation of the Parties (Dkt. 39). On November 26, 1984, Carr was issued building permit No. 233 R–1, a revised version of permit No. 233. On its face, permit No. 233 R–1 incorporates drawings dated February 22, 1984—the same drawings upon which No. 233 was based. These drawings apparently did not call for construction in the set back area. Plaintiff urges that he actually submitted his original May 1983 plans calling for construction in the set back area. Although the parties agree there was no written application for permit No. 233 R–1, Stipulation of the Parties (Dkt. 39), plaintiff offers two letters indicating he believed he had submitted the

"supplementing" the May 13 letter. Plaintiff characterizes the same letter as continuously

adding new objections and requirements to his application.

original drawings. Exhs. E & F, Stipulation of the Parties (Dkt. 39). Plaintiff infers defendants deliberately included the wrong drawings with the permit.

On December 9, 1985 another stop work order was issued by Fader to Carr in letter form. Since this is the most crucial contact in this case, it bears quoting in full:

> Your building permit # 0233 R–1 expired 11/26/85 and you should stop by for a new one before resuming work.
>
> Recently I made a field check of your construction "as built" for conformance with your drawings # 1, 2, & 3 revised 2/22/84, conveyed by your letter of October 19, 1984 and received by me on Oct. 27, 1984 as stated on your permit, and I find two deviations:—
>
> —At the second floor level, the reinforced concrete slab on the south side designated as "balcony" is not constructed per print in that it cantilevers south much closer to the property line than the 6′–0″ shown.
>
> —There are five reinforced concrete projections about one foot by two feet which project to the south side of the first floor slab, not shown on the drawings.
>
> The above discrepancies cannot be included in the new permit because they are new construction outside the previous permit and they do not conform to the current Code requiring a 6′–0″ setback from the ROW line on Van Dyke.
>
> Upon removal of the above, a new permit will be issued so work can be resumed.

DA–115; PA–105.

Plaintiff asserts the stop work letter was issued in retaliation for his unwillingness to acquiesce to the Town's policy (his "troublemaking") and his successful appeal to the Superior Court.[4] Defendants explain that the stop work letter was issued because of confusion. Defendants contend that Carr could build in contravention of

the Town's recently enacted set back ordinance, *see supra* text at 4, only those structures indicated in the revised permit (No. 233 R–1). Any additional construction beyond the scope of the revised permit would be "new" construction subject to the ordinance. Although Carr's original May 5, 1983 plans would have included construction referred to in the stop work letter, permit No. 233 R–1 was based upon drawings dated February 22, 1984, which did not include such structures. *See* DA–112. Thus the construction referred to in the stop work letter was "new" construction subject to the ordinance. The City Solicitor eventually resolved the matter by noting that there was confusion and that any technical deviation could be corrected with amended plans. DA–116; PA–106.

Plaintiff states the stop work letter was issued shortly before Fader left for a 3–month Florida vacation. He infers that the timing was intended to and did in fact cause him a three-month delay in construction with the result that the restaurant was not completed in time for the 1986 summer season. Defendants contend that Fader could be reached by telephone the entire three months and that a substitute inspector was available.

Finally, plaintiff offers what he characterizes as a "smoking gun memorandum" dated Nov. 2, 1985 in which Fader notes the Town could prevent Carr from building in the setback area, notwithstanding the decision of the Superior Court. The memo reads as follows:

> Per discussion with Bill Wright [the City Solicitor], Carr must conform to drawings on which Bldg. Permit was predicated.—Deviation from that design should be regarded as new construction and must conform to today's regulation.
>
> [Therefore] Third floor (Penthouse) floor slab which projects out to 12″ from Van Dyke Row line must be disallowed even though former court case would have allowed it.

**4.** Plaintiff also contends that defendants never attempted to clear up any confusion with regards to the expiration of the permit or the drawings upon which permit no. 233 R–1 was based prior to issuance of the stop work letter.

Affidavit of Ben Carr (Dkt. 40). Defendants note they never tried to revoke permit No. 233 R–1 due to expiration. They contend Carr was merely informed that he must build in conformity with the drawings attached to the permit.

DA–118; PA–107. Defendants assert the memo merely indicates that any construction not indicated in the building permit is not allowable under the new ordinance.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In 1986 the United States Supreme Court decided a trilogy of cases, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), in which it refocused the burdens of the movant and non-movant on motions for summary judgment.

When the movant has carried its burden under Rule 56(c), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355 (citation omitted) (footnote omitted). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both *genuine* and *material. Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10. A dispute over facts is "material" if, under the substantive law, it would affect the outcome of the suit. A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-movant. *Id.* at 248, 106 S.Ct. at 2510. Summary judgment will be entered "against a party who failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary

judgment. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). With these principles in mind, the court turns its attention to defendants' motion for summary judgment. The court will first address plaintiffs' Count II state law claims.

## THE STATE LAW CLAIMS

### 1. *Claims Relating to the December 9, 1983 Summons*

■  Plaintiff's claims for malicious prosecution, abuse of the legal process and false arrest arise, if at all, out of the same nucleus of facts—namely the issuance of the summons on December 9, 1983 in connection with the December 8, 1983 stop work order. *See* DA–124 & 127; PA–170.

Defendants assert that all claims based upon events occurring before December 7, 1985 (two years prior to the filing of the complaint in this case)—including those claims based upon the December 8, 1983 stop work order and the December 9, 1983 summons—are barred by the applicable statute of limitations. Plaintiff alleges that the events leading to the institution of this suit comprise a continuum of tortious misconduct. Since the last event—the December 9, 1985 stop work order—occurred within the limitation period, plaintiff argues his claims are not time-barred.

The causes of action alleged in Count II are state law claims. Consequently, the court must apply the Delaware's statute of limitations and state law concerning the doctrine of continuing violation to these claims. Delaware case law addressing continuing causes of action for statute of limitations purposes is largely confined to the medical malpractice context and was substantially superseded by the passage of a special limitation period for medical malpractice, 18 Del.C. § 6856, and *Ewing v. Beck*, 520 A.2d 653 (Del.Supr.1987), a decision by the Delaware Supreme Court defining a new cause of action for "continuous negligent medical treatment." Nevertheless, certain principles enunciated by the Delaware courts with regard to the continuing violation doctrine and to statutes of

limitation generally provide this court with some guidance.

In general, a cause of action accrues on the date the action could first be brought. *Curran v. Time Ins. Co.*, 644 F.Supp. 967, 972 (D.Del.1986). Courts may not extend the limitation period out of notions of fair play. *Nose v. Rementer*, 610 F.Supp. 191, 193 (D.Del.1985).

Some of the Delaware cases prior to the state Supreme Court's establishment of a cause of action for continuous negligent medical treatment in *Ewing v. Beck, supra,* discussed continuing violation in terms of inherently unknowable injuries. *E.g., Collins v. Wilmington Medical Ctr., Inc.,* 319 A.2d 107 (Del.Supr.1974); *Oakes v. Gilday,* 351 A.2d 85 (Del.Super.1976). The courts' rationale was simply that the limitation period should not begin to run until the plaintiff became aware that he had a cause of action. This doctrine was codified by 18 Del. C. § 6856, which extends the limitation period from two to three years in cases of injury not discovered within the two year period. The Delaware Courts have since rejected an open-ended approach to inherently unknowable injuries. The courts have read section 6856 narrowly to state that the cause of action accrues and the limitation period begins to run when the wrongful act or omission occurs and not when the injury is discovered, even if the injury is not discovered within the limitation period. *Dunn v. St. Francis Hosp.,* 401 A.2d 77 (Del.Supr.1979). Regardless, in this case plaintiff was aware of any injury or potential cause of action that may have accrued immediately or shortly after each alleged wrong occurred. Thus plaintiff cannot argue that the events in this case constitute a continuing cause of action under a theory of inherently unknowable injury assuming the theory survives in Delaware jurisprudence after *Dunn, supra.*

In *Ewing v. Beck,* the Delaware Supreme Court addressed the other context in which the continuing violation theory has been applied: the problem of cumulative injures arising from continuous negligent medical treatment. The court stated:

> A review of [the decisions] leads to the conclusion that a continuation of medical treatment has been found to be significant only when a course of treatment is so interrelated that there is no proper basis for compartmentalizing the chronology in applying the statute of limitations.

*Ewing,* 520 A.2d at 661. The court recognized the legitimacy of special treatment in cases of cumulative injury; however, it recharacterized the approach as a separate cause of action for continuous negligent medical treatment accruing on the date of the last act in the treatment.

With these principles in mind, the court now turns to the state law claims alleged in Count II of the complaint.

The elements of a cause of action for malicious prosecution under Delaware law are:

> 1) [T]he institution of civil proceedings; 2) without probable cause; 3) with malice; 4) termination of the proceedings in the aggrieved party's favor; and 5) damages which were inflicted upon the aggrieved party by seizure of property or other special injury.

*Nix v. Sawyer,* 466 A.2d 407, 411 (Del.Super.1983).[5] The applicable limitation period for malicious prosecution claims is the two-year period for personal injuries in 10 Del. C. § 8119. *Pagano v. Hadley,* 553 F.Supp. 171, 177 (D.Del.1982). The only proceeding initiated against plaintiff in this case is the summons issued on December 9, 1983. The proceeding was terminated in plaintiff's favor on January 6, 1984 when the summons was nolle prossed by the City Solicitor. Thus plaintiff could have brought an action for malicious prosecution on January 6, 1984, and that is the date upon which his cause of action accrued. His claim for malicious prosecution is based upon the discrete actions of the defendants in issuing the December 9, 1983 summons. He should have been aware of

---

**5.** Despite the lack of Delaware case law on the point, obviously the proceedings initiated may be criminal. See W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* 870–71 (5th Ed.1984).

any damages he sustained due to the summons no later than January 6, 1984. Further, any damages he sustained as a result of the summons can be ascertained without reference to the later stop work letter of December 9, 1985. This is not an instance of cumulative or inherently unknowable injury. Since the complaint was filed December 7, 1987, any claim plaintiff might have for malicious prosecution is barred by section 8119's two-year limitation period. Defendants' motion for summary judgment as to the claim for malicious prosecution will be granted.

■ Plaintiff's cause of action for abuse of process differs from his claim for malicious prosecution in that "the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying, process justified in itself for an end other than that which it was designed to accomplish." *Stevens v. Independent Newspapers, Inc.*, C.A. No. 85C–0C11 1986 WL 13086 (Del.Super. Oct. 7, 1986) (Chandler, J.) (available on LEXIS, states library, Del. file) (citing *Unit, Inc. v. Kentucky Fried Chicken Corp.*, 304 A.2d 320 (Del.Super.1973)). In order to state a claim for abuse of judicial process, plaintiff must show both an ulterior purpose and a wilful act using the process in a manner not proper in the regular conduct of the proceedings. *E.g., Nix v. Sawyer*, 466 A.2d at 412. Abuse of process is ordinarily characterized as a tort. *See generally* W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 121 (5th Ed.1984). However, Delaware law requires the court to focus on the particular injury suffered, rather than the nature of the cause of action. *See, e.g., Smith v. Goldstein*, 447 F.Supp. 1244, 1246 (D.Del.1978) (citing *Read v. Local Lodge 1284*, 528 F.2d 823, 825 (3d Cir.1975) and *Patterson v. Vincent*, 5 Del.Super. 442, 5 Terry 442, 61 A.2d 416 (1948)).

In his claim for abuse of process, Carr alleges no harm other than emotional injury and injury to his reputation. These kinds of injuries are personal injuries. *See, e.g., id.* at 1247 (quoting *Read v. Local Lodge 1284*, 528 F.2d 823, 825 (3d Cir.1975)) ("Thus, personal injuries involve injuries to a person's security, which consists 'in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health and his reputation.'"); *see also Pagano v. Hadley*, 553 F.Supp. at 177. Consequently, plaintiff's claim for abuse of the legal process is subject to section 8119's two-year limitation period for personal injuries.[6] Carr's claim is based exclusively on the issuance of the December 9, 1983 summons. Transcript at 52, *Carr v. Town of Dewey Beach*, C.A. No. 87–632 MMS (Oct. 31, 1989) (Dkt. 37) (hereinafter "Transcript at __"). The first day he could have brought an action for abuse of process would be December 9, 1983—the day the process issued. Even if he could not ascertain all damages flowing from the issuance of the summons at that time, he could have ascertained them by January 6, 1984, the day the summons was *nolle prossed.* His claim is thus barred as outside the two-year limitation period. Defendants' motion for summary judgment as to plaintiff's abuse of legal process claim will be granted.

■ Carr's claim for false arrest and his claim under article I, section 6 of the Delaware Constitution likewise arise from the December 9, 1983 summons. The tort of false arrest "protects personal interest in freedom from restraint of movement." *Pagano v. Hadley*, 553 F.Supp. at 175 (quoting Prosser, *Law of Torts* § 11 at 42 (1971)); *see also Chrisco v. Shafran*, 525 F.Supp. 613, 616 (D.Del.1981). Plaintiff explained at oral argument that his claim under article I, section 6 of the Delaware Constitution was "an attempt to make a State constitutional tort as far as the issuance of the December 1983 summons goes. It would be an illegal arrest, so to

---

**6.** The holding in *Smith v. Goldstein,* 447 F.Supp. 1244, 1247 (D.Del.1978), that the limitation period for contracts governed the abuse of legal process claim in that case is clearly distinguishable from the case before the court. In *Smith,* the court expressly found that the injuries alleged involved injuries to the plaintiff's business and possessions and thus did not involve personal injuries.

speak, under that section." Transcript at 59. Plaintiff's claim for false arrest and his claim under article I, section 6 of the Delaware Constitution also allege personal injury and section 8119's two-year limitation period applies. *See Pagano,* 553 F.Supp. at 176; *Chrisco,* 525 F.Supp. at 616. These claims accrued no later than January 6, 1984. At that point in time, plaintiff would have been aware of the so-called false arrest and any damages flowing therefrom. Plaintiff's claim for false arrest and his claim under article I, section 6 of the state constitution are likewise time barred, and defendants' summary judgment motion as to them will be granted.

### 2. *Plaintiff's Claim for Intentional Infliction of Emotional Distress*

■ Additionally, Carr alleges a state law claim for intentional infliction of emotional injury. In order to state a claim for intentional infliction of emotional distress, plaintiff must show that defendant's actions were both "extreme and outrageous" and that plaintiff suffered present physical injury as a result. *See, e.g., McKnight v. Voshell,* No. 168, 1985 (Del.Supr. Aug. 6, 1986) (reported as decision without published opinion at 513 A.2d 1319). The court need not decide whether plaintiff's continuing cause of action theory applies to this claim because Carr's claim clearly fails on the merits. Plaintiff has nowhere alleged that he suffered any physical injury as a result of defendants' conduct. He cannot state a claim solely for "hurt feelings." *McKnight, supra.* Defendants' motion for

summary judgment as to the claim for intentional infliction of emotional distress will be granted.

### 3. *Plaintiff's Claim Under Article I, Section 7 of the Delaware Constitution*

■ At oral argument, plaintiff's attorney explained that the claim under article I, section 7 of the state constitution is "a State constitutional due process type claim...." Transcript at 60. Elsewhere, he stated that the claim is "just sort of a restatement on State law grounds of the Federal constitutional issue" raised in plaintiff's claim under section 1983. Transcript at 58.

Plaintiff noted Delaware case law holding that the phrase "law of the land" in article I, section 7 has substantially the same meaning as the due process clauses in the fifth and fourteenth amendments of the United States Constitution. Plaintiff's claim raises the question of whether the Delaware Supreme Court would construe the state constitution to incorporate certain substantive due process holdings of the Third Circuit Court of Appeals.[7] *See infra.* It also raises an issue as to whether there exists an implied cause of action for money damages for claims asserted directly under article I, section 7. *See generally,* Friesen, *Recovering Damages for State Bills of Rights Claims,* 63 Tex.L.Rev. 1269 (1985) (discussing various states' responses to claims asserted for violations of the state constitution).

---

**7.** The Delaware courts have held that the phrase "law of the land" in article I, section 7 of the Delaware Constitution has substantially the same meaning as the due process clauses of the fifth and fourteenth amendments of the federal constitution. *In re Opinion of the Justices,* 246 A.2d 90, 92 (Del.Supr.1968). The state courts have also stated that they will follow the due process holdings of the United States Supreme Court. *General Elec. Co. v. Klein,* 106 A.2d 206 (Del.Supr.1954).

In *Bello v. Walker,* 840 F.2d 1124 (3d Cir.), *cert. denied,* — U.S. —— & ——, 109 S.Ct. 134 & 176, 102 L.Ed.2d 107 & 145 (1988), the Third Circuit Court of Appeals, following the Fourth Circuit's decision in *Scott v. Greenville County,* 716 F.2d 1409 (4th Cir.1983), held that deliber-

ate and arbitrary abuse of government power in denying a building permit violates an individual's right to substantive due process. *See infra.* The *Bello* decision was criticized by the Second Circuit in *RRI Realty Corp. v. Southhampton,* 870 F.2d 911 (2d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989). The Supreme Court has not ruled on the issue.

Although this court would be bound to follow Third Circuit precedent when construing the federal constitution, it is not clear that the Delaware Supreme Court would apply the same precedent to the state constitution where there is a divergence of opinion among the circuit courts and the Supreme Court has not decided the issue.

The court need not reach these issues, however, because it finds that Delaware's County and Municipal Tort Claims Act, 10 Del.C. §§ 4010–4013 ("Tort Claims Act" or "the Act"), immunizes both defendants from plaintiff's claim for damages under the Delaware Constitution.[8] Defendants failed to brief or argue their liability for claims asserted directly under the Delaware Constitution. In their answer, however, defendants asserted the Tort Claims Act as an affirmative defense. Since the issue of sovereign immunity affects the court's subject matter jurisdiction, *see, e.g., Dawson v. United States*, 894 F.2d 70 (3d Cir.1990); *see also* 14 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3654 (1985), the court will consider the effect of the Act on plaintiff's claim under article I, section 7 of the state constitution. The court will treat defendants' assertion of the Tort Claims Act as a motion to dismiss for lack of subject matter jurisdiction. *Dawson, supra.*

The Tort Claims Act provides government entities—including municipalities and their employees—immunity from suit "on any and all tort claims seeking recovery of damages." 10 Del.C. § 4011(a). The statute specifically provides that

> a governmental entity shall not be liable for any damage claim which results from: ... (2) The undertaking or failure to undertake any judicial or quasi-judicial act, including, but not limited to, granting, granting with conditions, refusal to grant or revocation of any license [or] permit ... or other administrative approval or denial. [or] (3) The performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not the ... ordinance ... under which the discretionary function or duty is performed is valid or invalid.

*Id.* § 4011(b)(2) & (3). Since plaintiff's state due process claim presumably is based upon the initial denial of the building permit in May 1983 and the issuance of the two stop work letters, it is precisely the type of claim the Act was intended to bar. The fact that the actions taken by the municipality and its employee may have been wrongful does not prevent defendants from asserting their immunity. *Artesian Water Co. v. New Castle County*, C.A. No. 5106 at 14, 1983 WL 17986 (Del.Ch. Aug. 4, 1983) (Hartnett, V.C.) (available on LEXIS, states lib., Del. file) (LEXIS pagination).

The Tort Claims Act bars plaintiff's damages claim under article I, section 7 of the Delaware Constitution unless the claim comes within one of the exceptions provided by the Act.

Section 4011(c) of the Act provides:

> An employee may be personally liable for acts or omissions causing property damage, bodily injury or death in instances in which his or her governmental entity is immune under this section, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent.

Carr alleges that Fader, with the concurrence of various Town officials including the Mayor, issued the December 9, 1985 stop work order with the malicious intent of delaying construction of plaintiff's building. He also alleges that defendants succeeded in delaying the opening of the restaurant for the 1986 summer season, thus causing him lost profits.

By its terms, section 4011(c)'s exception applies only to employees and not entities. *Farris v. Moeckel*, 664 F.Supp. 881, 896 (D.Del.1987). The Tort Claims Act, therefore, bars plaintiff's state constitution claim against defendant Dewey Beach even if the stop work order was issued with willful and malicious intent.

■ The court also holds that section 4011(c)'s exception is also inapplicable to defendant Fader in this case. The exception narrowly defines both the type of actions and the type of injuries for which

---

8. The court notes that the Delaware Tort Claims Act is inapplicable to plaintiff's federal claim under § 1983. *See Mancini v. Lester,* 630 F.2d 990, 994–95 (3d Cir.1980) (per curiam) (New Jersey Tort Claims Act does not immunize defendants from a violation of plaintiff's federal constitutional rights).

immunity is waived. Under the exception, the employee is liable only for "acts or omissions causing property damage, bodily injury or death." The court declines to construe the covered injuries as a blanket term and instead finds that employee's immunity is waived only for specific kinds of injuries. Plaintiff fails to allege "property damage, bodily injury or death" resulting from Fader's action. At most, plaintiff claims lost profits resulting from the delay in construction engendered by the stop work letter. He claims no physical damage to the property itself. By its terms, therefore, section 4011(c)'s exception is inapplicable to defendant Fader, and plaintiff's claim under article I, section 7 will be dismissed as to both defendants.[9]

■ The holding as to the applicability of the Tort Claims Act to the actions of both defendants applies equally to plaintiff's other state law claims and thus serves as alternative basis for the court's grant of summary judgment as to the claims for malicious prosecution, abuse of process, false arrest, intentional infliction of emotional distress and violation of article I, section 6 of the state constitution.

In summary, plaintiff's claims for malicious prosecution, abuse of process, false arrest, and violation of article I, section 6 are barred by the statute of limitations. Plaintiff has failed to state a claim against the defendants for intentional infliction of emotional distress. The Delaware Tort Claims Act immunizes both Fader and the Town of Dewey Beach and bars plaintiff's claim under article I, section 7 of the Delaware Constitution and all other state law claims. Summary judgment will therefore be granted as to the claims alleged in Count II of the complaint.

## PLAINTIFF'S SECTION 1983 CLAIM

### 1. *Statute of Limitations*

Defendants assert that all allegations in Count II of the complaint based upon events occurring prior to December 7, 1985, two years before the filing of the complaint, are not actionable under the applicable statute of limitations. Plaintiff responds by alleging that the events leading to the institution of this suit comprise a continuum of tortious misconduct. Since the last event—the December 9, 1985 stop work order—occurred within the applicable limitation period, plaintiff argues all allegations in his claim under section 1983 are actionable based upon a continuing cause of action theory.

Initially, the court must determine the applicable limitation period. Delaware's two-year limitation period for personal injuries, 10 Del.C. § 8119, applies to actions under section 1983. *See Wilson v. Garcia*, 471 U.S. 261, 277-80, 105 S.Ct. 1938, 1947-49, 85 L.Ed.2d 254 (1985) (holding that the states' personal injury statutes of limitation should be applied for claims under section 1983); *Cuffy v. Getty Refining & Marketing Co.*, 648 F.Supp. 802, 807 (D.Del.1986) (following *Wilson* and applying section 8119 to claims under sections 1983 & 1981); *Vanaman v. Palmer*, 506 A.2d 190, 191-92 (Del.Super.1986) (same). At first blush then, claims accruing more than two years prior to the filing of the

---

**9.** The court's holding is not in conflict with article I, section 9 of the state constitution, which provides:

> All courts shall be open; and every man for injury done him in his reputation, or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial or unreasonable delay or expense. Suits may be brought against the State, according to such *regulations as shall be made by law.*

In *Artesian Water Co., supra*, Vice Chancellor Hartnett held that the Tort Claims Act immunized local government entities (in that case New Castle County) from "claims for damages." *Id.* at 7, 15 (LEXIS pagination) 1983 WL 17986.

The plaintiff in that case sought redress from the county for pollution of its water supply resulting from contaminated groundwater seepage from a County landfill. Plaintiff asserted a due process challenge to the Act based upon article I, section 9. In denying the challenge, Vice Chancellor Hartnett stated: "The due process clause does not act as a repeal of the doctrine of sovereign immunity. Rational legislation creating immunity serves an important interest of the State in controlling the effect of a tort law on the government's ability to function. §§ 4010–4013 meet that test and are therefore not subject to a due process violation challenge." *Id.* at 14, 1983 WL 17986 (citations omitted).

complaint on December 7, 1985 should be barred by section 8119.

The second and more difficult question for the court is determining when plaintiff's causes of action based upon the various events alleged in the complaint accrued under section 1983. Defendants characterize Count I of the complaint as stating three distinct causes of action based upon the May 13, 1983 denial of the initial application, the issuance of the December 8, 1983 stop work order and December 9, 1983 summons, and the issuance of the December 9, 1985 stop work letter. Under defendants' theory, the first two of these claims are time-barred by section 8119. Plaintiff, on the other hand, characterizes his section 1983 claim as a single cause of action based upon a series of events beginning with the May 13, 1983 denial and culminating in the December 9, 1985 stop work letter. He asserts his cause of action under section 1983 is not time-barred because the final event in the continuum—the December 9, 1985 stop work order—occurred within the limitation period.

■ Although state law determines the applicable limitation period for claims under section 1983, federal law determines the date of accrual of a section 1983 cause of action. *Deary v. Three Un-named Police Officers*, 746 F.2d 185, 197 n. 16 (3d Cir.1984). A section 1983 claim accrues when the plaintiff knows or has reason to know of the injury that forms the basis of his cause of action. *Id.; see also Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir.1982) (per curiam); *Cuffy v. Getty Refining & Marketing Co.*, 648 F.Supp. at 808. Under a continuing violation theory, if the defendant engaged in a continuing course of conduct and plaintiff's action is timely as to any act in that course of conduct, plaintiff may be permitted to litigate violations that are part of the course of conduct. *Van Heest v. McNeilab, Inc.*, 624 F.Supp. 891, 896 (D.Del.1985).

Plaintiff can prevail under a continuing violation theory, however, only if he can show "more than the occurrence of isolated or sporadic acts...." *Jewett v. International Tel. & Tel. Corp.*, 653 F.2d 89, 91–92

(3d Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981). In order to determine whether a series of events constitute discrete actions or a continuing course of conduct, the court must first identify precisely the practice complained of and separate it from its inevitable, but neutral consequences. *Bronze Shields, Inc. v. New Jersey Dept. of Civil Serv.*, 667 F.2d 1074, 1083 (3d Cir.1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982); *Van Heest*, 624 F.Supp. at 896.

The court understands plaintiff in this matter to complain of two practices: (i) the application to Carr of the Town's unwritten policy prohibiting construction within six feet of a side street and (ii) retaliatory acts, most notably the two stop work orders and the December 9, 1983 summons, by the defendants against Carr due to his refusal to abide by the Town's practice. Carr knew or should have known of any injury forming the basis of a cause of action as to the application to him of the Town's unwritten policy no later than September 6, 1984—the date on which that policy was invalidated by the Delaware Superior Court. *See Gordon v. City of Warren*, 579 F.2d 386, 392 (6th Cir.1978) (Limitation period for action brought against city and its planning commission based upon city ordinance effectively prohibiting erection of any building within 200 feet of proposed right of way did not begin to run until restraint on property was lifted when state supreme court declared ordinance invalid.). More than two years having elapsed between the accrual of the cause of action and the filing of the complaint, summary judgment will be granted as to plaintiff's claim under section 1983 insofar as it is based upon the application to him of the set back policy.

■ Plaintiff also alleges a pattern of tortious misconduct by the defendants, specifically the stop work order and summons issued in December 1983 and the December 1985 stop work letter, in retaliation for his refusal to passively abide by the Town's setback policy. He points to a memorandum written by defendant Fader as de-

monstrative of the defendants' retaliatory intent.[10] PA at 138–145. Carr alleges the defendants' actions created substantial delay in the construction of his business and caused him financial loss as a result. The December 9, 1985 stop work letter falls within § 8119's two-year limitation period, and any claims based thereon are thus actionable. The question for the court is whether the December 8, 1983 stop work order together with the December 9, 1983 summons and the delay caused thereby are so intimately connected to the December 9, 1985 stop work letter as to constitute a continuing violation.

In the civil rights context, the issue of continuing violation most frequently arises in suits alleging employment discrimination. Plaintiffs in these suits allege a policy of discrimination on the part of the employer resulting in specific acts of discrimination against them. The policy is considered an ongoing violation and serves to allow litigation for acts occurring outside the limitation period. *Jewett,* 653 F.2d at 91 ("Suits may be brought by victims of one or more discriminatory acts occurring before the limitations period, so long as the plaintiff establishes that the offending practice is an ongoing one."). In such cases, "[t]he preponderance of the evidence must establish that some form of intentional discrimination against the *class* of which plaintiff was a member was the company's 'standard operating procedure.'" *Id.* at 91–92 (citation omitted) (emphasis added).

The *continuing violation* doctrine in these employment discrimination cases is aimed not so much at the discrete discriminatory acts of the employers, but rather at the *policy* of discrimination against an entire *class* of plaintiffs. There is no similar policy connecting the acts alleged here. Plaintiff alleges a "policy" of retaliation against him personally, but he nowhere alleges any policy of retaliation against individuals who

challenge the Town's practice. Even if, as plaintiff asserts, the two stop work orders were motivated by the same retaliatory intent, they were discrete acts which occurred over two years apart, not the implementation of an ongoing policy.

In order to show a continuing violation, plaintiff must allege more than discrete acts similarly motivated. For example, in *Cuffy v. Getty Refining and Marketing Co., supra,* this court held that defendant Getty's failure to promote Cuffy and its alleged breach of an EEOC Settlement Agreement in 1981 were insufficiently related to Getty's suspension of Cuffy in 1984 to constitute a continuing violation:

> Moreover, the discriminatory nature of each act is not of itself sufficient to demonstrate the necessary relationship. There is simply no intrinsic connection between these events, other than the involvement of the defendant, to show that they are part of a pattern of discrimination. These acts are best understood as "isolated instances of discrimination," and insufficient to support a continuing violation theory.

*Cuffy,* 648 F.Supp. at 810; *see also Bronze Shields, Inc. v. N.J. Dept. of Civil Serv.,* 667 F.2d at 1080–1084 (holding that continued use of an eligibility roster for hiring did not constitute an ongoing violation so as to preserve plaintiffs' claims after they learned their names were excluded from the roster).

In this case, Carr alleges two discrete events: issuance of the stop work order and summons in December 1983 and the December 9, 1985 stop work letter. These events occurred more than two years apart, and plaintiff has been unable to point to any retaliatory acts on the part of defendants in the intervening years. He alleges only that both acts were perpetrated by the same actors (defendants) for the same purpose (retaliation). Plaintiff's allegations

---

**10.** Plaintiff claims that defendants' frustration with his attempts to reverse denial of his permit and his ultimate success in the Superior Court was the motive behind the issuance of the two stop work orders. The memorandum he cites was addressed to the Board of Adjustment prior to its hearing regarding Carr's permit. It reviews the defendants' dealings with Carr in great detail and takes a critical tone towards plaintiff's behavior. For example, Fader writes: "This illustrates the endless arguing, challenging, wasting of time and energy, and letter writing typical of our disputes with Carr." PA at 140.

are insufficient to demonstrate an ongoing policy.

Moreover, damages, i.e., the amount of delay caused by each alleged retaliatory act, may be ascertained discretely. Thus Carr's causes of action regarding the two stop work orders may be compartmentalized. There is no cumulative harm meriting plaintiff's characterization of the two stop work orders as a continuing wrong despite the retaliatory motive that he alleges is common to both. *Cf. Page v. United States*, 729 F.2d 818, 821–23 (D.C.Cir.1984) (wrongful prescription of addictive drugs without proper monitoring resulting in addiction constitutes a continuing violation); *Jewett*, 653 F.2d at 90–91 (allegation that practice of intentional sex discrimination disadvantaged plaintiff in her opportunity for training and thus continued to disadvantage her in promotion states a continuing violation). Consequently, plaintiff's section 1983 claim with regard to the December 8, 1983 stop work order and the December 9, 1983 summons is barred by the statute of limitations. Summary judgment as to this claim will be granted.[11]

2. *Liability of Defendant Town of Dewey Beach Under Section 1983*

██ Plaintiff's remaining section 1983 claim is based upon the December 9, 1985 stop work letter issued by defendant Fader with the concurrence of the Mayor and Town Solicitor of Dewey Beach. *See* PA–105; DA–115 (letter from Fader to Carr notifying Carr of the expiration of his permit and other violations and requesting that construction cease); PA–107; DA–118 (memorandum from Fader to the file prior to stop work letter detailing instances of non-conformity with the permit). Carr alleges that the stop work letter was issued in retaliation for his successful reversal of the Town's denial of his permit in Delaware Superior Court, and resulted in deprivation of his federal substantive due process rights. Before reaching the merits of plaintiff's section 1983 claim, however, the court must consider whether the Town can be held liable in light of a series of U.S. Supreme Court decisions concerning municipal liability under section 1983. Because the summary judgment motion is that of defendant, Carr's version of events must be accepted for purposes of deciding the Town's liability.

In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 695–701, 98 S.Ct. 2018, 2038–41, 56 L.Ed.2d 611 (1978), the United States Supreme Court reversed its previous position in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and held that municipalities are "persons" within the meaning of section 1983 and may be sued under the statute. Since a municipality can act only through its employees, the actions of a municipality's employees may create liability in the municipality. The Court in *Monell* concluded, however, that municipalities cannot be held vicariously liable under section 1983 for the actions of their employees. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037 ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.").

Municipalities are liable under § 1983 only when "their official policies cause their employees to violate another person's constitutional rights." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988); *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Under *Monell* a municipality incurs section 1983 liability when its employees acting pursuant to an official "policy" or "custom" violate a person's constitutional rights. Subsequent Supreme Court decisions hold a municipal

---

11. In his brief, plaintiff raised the admissibility of evidence concerning events occurring outside the limitation period should the court find that no continuing cause of action existed. *See Alexander v. Local 496, Laborer's Internat'l Union of North America*, 655 F.Supp. 1446, 1450 (N.D. Ohio 1987); *see generally Clark v. Township of Falls*, 890 F.2d 611 (3d Cir.1989). Since this issue was not fully briefed and argued, the court declines to address it at this time.

policy may be inferred from a "single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 923; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–84, 106 S.Ct. 1292, 1298–1300, 89 L.Ed.2d 452 (1986). In order to state a cause of action against the Town, therefore, plaintiff must demonstrate that Fader issued the stop work letter pursuant to a policy or custom of Dewey Beach or that he possessed final policymaking authority to do so.

It is clear from the record before the court that Fader was not acting pursuant to any policy or custom of Dewey Beach. Plaintiff nowhere alleges or offers evidence of a Dewey Beach policy or custom of retaliation against residents who challenge its setback policy. Consequently, if the Town is liable to plaintiff under section 1983 it is because Fader possessed final policymaking authority with regard to issuing stop work letters or because his actions were ratified by officials possessing such authority.

In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Court elaborated upon the standard for determining when the isolated act of a single municipal official suffices to create liability in the municipality under section 1983. Justice Brennan writing for a plurality in *Pembaur* stated that "not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possess *final* authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1292 (emphasis added).

The Court in *Praprotnik* attempted to clarify the meaning of "final" policymaker, but failed to reach a majority position. In *Praprotnik*, the plaintiff, a municipal employee, challenged his transfer and subsequent layoff, alleging both actions were taken by his immediate supervisors in retaliation for his successful appeals of their prior decisions to the city's Civil Service Commission. Justice O'Connor began her plurality opinion by noting the four guiding principles for determining municipal liability developed by Justice Brennan in *Pembaur*:

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. Third, whether a particular official has "final policymaking authority" is a question of *state law*. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.

*Id.* 485 U.S. at 123, 108 S.Ct. at 924 (citations to *Pembaur* omitted).

The identification of local government officials who possess final policymaking authority with regard to a given act is a question of law to be resolved by the trial judge. *Jett v. Dallas Independent School Dist.*, —— U.S. ——, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *Praprotnik*, 485 U.S. at 124, 108 S.Ct. at 924. The plurality in *Praprotnik* held that the court must look exclusively to state law and determine where it places final policymaking authority.[12] *Praprotnik*, 108 S.Ct. at 924–25 ("[W]e can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting poli-

---

**12.** Justice Brennan, joined by Justices Marshall and Blackmun, disputed the plurality's holding in *Praprotnik* that the court must look exclusively to state law to determine where final policymaking authority lies. He suggests that the question is one for the jury, which should look to state law as a starting point but must ultimately determine where actual or de facto authority is placed. *Id.* at 142–44, 108 S.Ct. at 933–34 (Brennan, J., concurring).

cy in any given area of a local government's business." (footnote omitted)).

Delaware law provides that the "legislative bod[ies]" of cities and incorporated towns may "regulate and restrict the height, number of stories and size of buildings and other structures ... and the location and use of buildings...." 22 Del.C. § 301 (1987 Repl.). State law also provides that "[i]n case any building or structure is ... constructed ... in violation of this chapter or of any ordinance or other regulation made under authority conferred thereby, the *proper local authorities of the municipality,* in addition to other remedies, may institute any appropriate action or proceeding to prevent such unlawful erection, construction, reconstruction ... or use to restrain, correct or abate such violation...." 22 Del.C. § 308 (emphasis added). Such "appropriate action" would include the issuance of a stop work letter. The legislative body of a Delaware municipality, therefore, possesses authority to set generally applicable policy regulating construction and buildings by passing ordinances, zoning codes, etc. State law does not indicate the identity of the "proper local authorities" that enforce individual violations of building regulations and requirements. Consequently, the court must turn to the local law of Dewey Beach to determine wherein final policymaking authority to issue stop work letters lies.

The legislative power for the Town of Dewey Beach is vested in the Commissioners of Dewey Beach, a five-member body including the Mayor. An Act to Incorporate the Town of Dewey Beach, 63 Del. Laws 75 at § 3 (1981) (hereinafter "Town Charter at § ___"). The Commissioners are empowered to

> regulate and control the number of buildings or removal of dwelling houses and other buildings; to establish a code for the same and to provide for the granting of permits for the same; to establish a building line for buildings to be erected; zone or district the Town and make particular provisions for particular zones or districts with regard to building or building materials; and, generally to exercise all the powers and authorities vested in

the legislative body of cities and incorporated towns under by [sic] the Constitution and Laws of this State.

Town Charter at § 23(a)(5).

The Mayor is a Commissioner of the Town of Dewey Beach and is under a duty to see that the laws and ordinances of the Town are faithfully executed. *Id.* at § 14(b). The Town Solicitor of Dewey Beach "give[s] legal advice to the Commissioners and other offices of the Town and ... perform[s] other legal services as may be required of him by the Commissioners." *Id.* at § 18. As Building Inspector, Fader was "responsible for implementation of Town Zoning Regulations in all phases of construction within Town corporate limits." Position Description, Building Inspector for Town of Dewey Beach, DA–128.

Delaware state law requires that all incorporated towns provide for a Board of Adjustment ("Board"), which may "make special exceptions to the terms of the ordinance in harmony with its general purpose and intent and in accordance with general or specific rules therein contained." 22 Del.C. § 321. The powers granted the Board under state law bear quoting at length:

> (a) The board of adjustment may:
>
> (1) Hear and decide appeals where it is alleged there is error in any order, requirement, decision or determination made by an administrative official in the enforcement of this chapter or of any ordinance adopted pursuant thereto;
>
> (2) Hear and decide special exceptions to the terms of the ordinance upon which the board is required to pass under such ordinance;
>
> (3) Authorize, in specific cases, such variance from any zoning ordinance, code or regulation that will not be contrary to the public interest, where, owing to special conditions or exceptional situations, a literal interpretation of any zoning ordinances, code or regulation will result in unnecessary hardship or exceptional practical difficulties to the owner of property....

(b) In exercising the powers provided in subsection (a) of this section the board may, in conformity with this chapter, reverse or affirm, wholly or partly, or may modify the order, requirement, decision or determination appealed from and may make such order, requirement, decision or determination as ought to be made, and to that end shall have all the powers of the officer from whom the appeal is taken.

22 Del.C. § 327. A party may appeal the decision of the Board by statutory certiorari to the Delaware Superior Court. 22 Del.C. § 328.

As the legislative body of the Town, the Commissioners set generally applicable policy with respect to zoning and the regulation of construction. The Building Inspector, the Mayor, the Town Solicitor, the Board and the Superior Court each possess some authority with regard to enforcing individual violations of the building policies set by the Commissioners. However, only the actions of the municipal official possessing *final* authority to set policy with regards to enforcement of the building codes and ordinances can subject the municipality to section 1983 liability. *Pembaur*, 475 U.S. at 481–82, 106 S.Ct. at 1292 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.").

Plaintiff argues that even if Fader did not possess final policymaking authority to issue stop work letters, his actions were approved by the Mayor and City Solicitor. Plaintiff contends that the Mayor's ratification suffices to create section 1983 liability in the Town. While the Building Inspector and the Mayor can issue stop work letters, they do not possess *final* policymaking authority to do so because their actions are appealable to the Board of Adjustment. Although the Board does not issue stop work letters, it has authority to review *"any* order, requirement, decision

or determination made by an administrative official in the enforcement [of the zoning code]." 22 Del.C. § 327(a)(1) (emphasis added). Consequently, the Board has final authority within the municipality to determine the validity of a stop work letter.[13]

This interpretation conforms with the plurality's position in *Praprotnik*. In *Praprotnik*, the plurality stated:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 925–26. Justice Brennan interpreted the plurality's position to mean that "whenever the decisions of an official are subject to some form of review—however limited—that official's decisions are nonfinal. Under the plurality's theory, therefore, even where an official wields policymaking authority with respect to a challenged decision, the city would not be liable for that official's policy decision unless *reviewing* officials affirmatively approved [the action]...." *Id.* at 144–45, 108 S.Ct. at 934–35 (Brennan, J. concurring). Subsequent interpretations of the *Praprotnik* decision have likewise held that the possibility of meaningful review precludes a final decision. *See Worsham v. City of Pasadena*, 881 F.2d 1336, 1340–41 (5th Cir.1989) ("The plurality view in *Praprotnik* compels us to conclude that the existence of this meaningful review by the City Council indicates that the city officials ... were not ... final policymakers"); *Praprotnik v. City of St. Louis*, 879 F.2d 1573, 1576 (8th Cir.1989) (on remand) ("As a general rule, decisions of the mayor and aldermen which specifically address and adversely affect individual employees are not 'final' for purposes of § 1983 because those decisions are subject

---

**13.** While the decisions of the Board are appealable to the Superior Court, the court is not a municipal body and therefore not a "proper

local authority" within the meaning of 22 Del.C. § 308 or a final policymaker within the meaning of *Pembaur* and *Praprotnik*.

to review by the Commission."); *Gray v. County of Dane*, 854 F.2d 179, 184 (7th Cir.1988) ("The existence of workable review procedures at the County level ... undermines [plaintiff's] claim that there was a custom or practice of discrimination and retaliation so well-established as to embody unwritten municipal policy.").[14]

Plaintiff Carr could have appealed the issuance of the stop work letter to the Board of Adjustment, but he chose not to do so.[15] Since the Board never considered the matter, no final decision was ever made concerning the stop work letter and the Town cannot be held liable.[16] Defendant Town of Dewey Beach's motion for summary judgment on plaintiff's section 1983 claim against it will be granted. The claim against defendant Fader in his official capacity as Building Inspector is functionally a claim against the Town and summary judgment will likewise be granted as to the claim against Fader in his official capacity. Fader did act, however, under color of state law, and thus plaintiff may proceed on the merits against defendant Fader in his individual capacity under section 1983.

### 3. *Merits of Carr's Section 1983 Claim*

Defendant Fader has moved for summary judgment on the merits as to the federal constitutional claims under section 1983.[17] Count I of the complaint alleges that plaintiff has been deprived of "substantive and procedural due process of law, and the equal protection of the laws of the United States Constitution in violation of the Fourteenth Amendment to the Constitution of the United States of America. Further, defendants' actions have denied plaintiff the privileges and immunities of citizenship in violation of Article IV, Section 2 of the United States Constitution." Plaintiff does not challenge the ordinance or the procedure under which the stop work order was issued. Rather he alleges misconduct in the application of the ordinance and procedure directed against him. His claim is governed, therefore, by the decision of the Third Circuit Court of Appeals in *Bello v. Walker*, 840 F.2d 1124 (3d Cir.), *cert. denied,* —— U.S. —— & ——, 109 S.Ct. 134 & 176, 102 L.Ed.2d 107 & 145 (1988).

In *Bello*, the plaintiffs were denied a permit to build Phase V of their proposed development by the municipality's "Code Enforcement Officer," ostensibly because the order of construction deviated from their initial proposal. Plaintiffs appealed the denial to the Pennsylvania state courts

---

**14.** The court recognizes that at least one court has held *contra.* In *Barkley v. City of Jackson,* 705 F.Supp. 390, 392 (W.D.Tenn.1988), the court stated:

> The essence of the city's argument is that the Mayor and the City Commission, who terminated Barkley upon Chief Alderson's recommendation, are not "policymakers" within the meaning of *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), because their decision was subject to review by the Civil Service Commission. The court *finds* untenable any argument that the personnel decisions of the Mayor and the Jackson City Commission do not represent official city policy. *St. Louis v. Praprotnik* did not alter the basic proposition that municipalities are liable for injuries inflicted by "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. New York Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

**15.** The court notes that the Town Solicitor resolved the matter no later than February 13, 1986, determining that "[t]o the extent there

may be some technical deviations from the plans, they can be corrected easily with amended plans." DA–116; PA–106. Consequently, there was no need for plaintiff to appeal.

**16.** *See generally Luna v. City and County of Denver,* 718 F.Supp. 854 (D.Colo.1989) which held:

> [Plaintiff] had a right of appeal to the hearings officer, who reports "solely and directly" to the Board. Therefore the Board is the final policymaking authority regarding [plaintiff's] promotion.
> .... Because [plaintiff] did not appeal his case to a hearings officer and because no appeal was taken to the Board, there has been no final policy decision regarding [plaintiff's] promotion....

*Id.* at 859 (citation omitted).

**17.** Both defendants moved for summary judgment on the merits of the § 1983 claim. In light of my decision that the Town cannot be held liable for violation of § 1983 under *Praprotnik,* I will treat the motion for summary judgment on the merits of the § 1983 claim that of the remaining defendant only.

and eventually prevailed. They then filed suit under § 1983 alleging violation of their substantive and procedural due process rights, violation of their equal protection rights, an unconstitutional taking of their property without compensation and violation of federal antitrust laws. They based their claims on allegations that a number of municipal officials improperly influenced the decision to deny them a permit for personal reasons. *Id.* at 1126–27.[18]

The Third Circuit Court of Appeals reversed the district court's grant of summary judgment against the plaintiffs with regard to their substantive due process claim, holding that "the deliberate and arbitrary abuse of government power violates an individual's right to substantive due process." *Id.* at 1129. The court's analysis bears quoting in full:

We need not define, at this juncture, the outer limits of the showing necessary to demonstrate that a governmental action was arbitrary, irrational, or tainted by improper motive. The plaintiffs in this case presented evidence from which a fact finder could reasonably conclude that certain council members, acting in their capacity as officers of the municipality improperly interfered with the process by which the municipality issued building permits, and that they did so for partisan political or personal reasons unrelated to the merits of the application for the permits. These actions can have no relationship to any legitimate governmental objective, and if proven, are sufficient to establish a substantive due process violation actionable under section 1983. While the defendants claim that the building permit was denied because of plaintiffs' failure to build in numerical sequence, thus presenting an arguably rational ground for the denial of the per-

mit, it is the factfinders' role to resolve this factual dispute.

*Id.* at 1129–30 (footnote omitted).[19] Plaintiff Carr has alleged that defendant Fader improperly issued the December 9, 1985 stop work letter in retaliation for his successful appeal to the Superior Court. Retaliation is an improper motive for issuing the stop work order. Thus if plaintiff can prove his allegation that Fader acted with retaliatory intent, he may prevail on his substantive due process claim. *See generally Neiderhiser v. Borough of Berwick,* 840 F.2d 213, 217–18 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988) (video store owner denied zoning permit because of contents of some movies he sells or rents may have a substantive due process claim under *Bello*); *de Botton v. Marple Twp.,* 689 F.Supp. 477, 481 (E.D. Pa.1988) (arbitrary refusal to grant curative amendment from denial of zoning variance may amount to violation of substantive due process under *Bello*).

Although defendant Fader attempts to distinguish *Bello* on the ground that the facts in that case presented a much clearer inference of improper behavior by the municipal officers than do the allegations of the plaintiff, Carr has alleged sufficient facts from which a factfinder could infer improper motive on the part of Fader. The court cannot weigh the evidence when deciding a motion for summary judgment. Summary judgment should not be granted merely because the court believes the movant will prevail at trial. Nor should the court grant summary judgment in the belief that a jury verdict for the non-movant at trial would be set aside as against the weight of the evidence. *See* 6 J. Moore & J. Wicker, *Moore's Federal Practice* § 56.15[6] at 56–324 (1986). Any inferences to be drawn from the underlying facts must be viewed in the light most favorable

---

18. Specifically, plaintiffs presented evidence indicating that certain members of the town council were strongly opposed to multi-unit housing, including their project, and that two members of the council had personal animosity towards one of the plaintiffs' employees, Raymond Kirich.... According to the affidavits ... various defen-

dant members of the council admitted in conversations that [the two council members] had pressured them to hinder plaintiffs' development as long as [plaintiff] employed Kirich. *Bello,* 840 F.2d at 1127.

19. The court denied the takings claim. *Id.* at 1130–31.

to the party opposing summary judgment. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). Although defendants allege the stop work letter was issued because of confusion concerning whether work had stopped at the site and which set of plans the permit was based upon, this is an issue of fact for the jury to decide. In this case, Carr has put into the summary judgment record sufficient facts from which a jury could conclude Fader issued the stop work order in retaliation for Carr's successful appeal. Consequently, defendant's motion for summary judgment will be denied as to plaintiff's substantive due process claim under section 1983.

■ Defendant's motion will be granted, however, as to Carr's procedural due process claim. Delaware law provides ample opportunity to challenge the issuance of stop work letters. Those aggrieved by the decision of an administrative official's action enforcing the zoning or building code may appeal the decision to the Board of Adjustment and then to the Delaware Superior Court. 22 Del.C. §§ 327–328. "[A] state provides adequate [procedural] due process when it provides 'reasonable remedies to rectify a legal error by a local administrative body.'" *Bello,* 840 F.2d at 1128 (quoting *Cohen v. City of Philadelphia,* 736 F.2d 81, 86 (3d Cir.), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984)). Since meaningful review of Fader's decision to issue the stop work letter was available to plaintiff, Carr's procedural due process claim is without merit.

■ Fader's motion for summary judgment will also be granted as to Carr's equal protection claim. Plaintiff's equal protection claim is murky, at best. The complaint recites equal protection as a basis for relief

without more. The difficulty is compounded because plaintiff did not brief the equal protection claim. Instead, without elucidating or tying his equal protection theory to the facts, plaintiff's counsel stated at oral argument that he was relying on the fact that applicants for building permits who were in favor with town officials received preferential treatment. Plaintiff cites two instances of alleged preferential treatment. The first is where Fader, at the request of the mayor (Vavala) permitted the mayor and a builder to come to Fader's home in Newark, Delaware (a two-hour drive from Dewey Beach) to discuss a building permit or certificate of occupancy which Fader ultimately granted at the mayor's request. PA–38 and 40. The only other instance plaintiff identified in support of his equal protection claim is that rather than wait for the next meeting date, a poll of the Town Commissioners was taken with respect to a request for permission to drive pilings which was granted. PA–97–100. Fader is not a Town Commissioner. The Town Commissioners are a legislative body which establishes general policies. *See supra.* The Commissioners do not grant or revoke building permits or issue stop work orders.

The most I can deduce is that plaintiff is asserting he was denied equal protection because of selective enforcement of the building code. Assuming this is plaintiff's theory, he would have to establish that in the administration of the building code, he was subject to purposeful discrimination and thereby treated in a different manner than other people. *Jureczki v. City of Seabrook, Texas,* 760 F.2d 666, 669 (5th Cir.1985), *reh'g denied,* 765 F.2d 1120, *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986).[20] He has failed to make the requisite showing. Significantly and most importantly, missing from the summary judgment record is any evidence that plaintiff was treated differently from

**20.** This assumes that the Third Circuit Court of Appeals would adopt the reasoning of the Fifth Circuit that "unequal application of facially valid building regulations can result in equal protection violations." *Jureczki,* 760 F.2d at 669 (citing *Bennett v. City of Slidell,* 728 F.2d 762 (5th Cir.1984)).

In *Bello v. Walker,* 840 F.2d 1124 (3d Cir. 1987), the Third Circuit dismissed without discussion plaintiff's equal protection claim as meritless. *Id.* at 1126 n. 1. Given the factual similarity between *Bello* and the case *sub judice,* it is likely the appellate court would find no equal protection violation.

any other applicant who sought to intrude upon the six-foot set back requirement subsequently held invalid. The two cited instances are in no way related to the set back requirement that was the focal point of plaintiff's difficulty, and one does not even involve Fader in any type of decision-making capacity. These two instances do not remotely demonstrate plaintiff was the victim of purposeful discrimination constituting an equal protection violation. Summary judgment will be granted on Carr's equal protection claim.

■ Likewise, Carr fails to state a claim under the privileges and immunities clause. He nowhere alleges nor offers proof that he was burdened solely because he is the citizen of another state. Consequently, summary judgment will be granted on Carr's claim under article IV, section 2 of the United States Constitution.

CONCLUSION

Defendants' motion for summary judgment in this case will be granted in part and denied in part. Summary judgment will be granted to defendant on plaintiff's state law claims as set forth in Count II of the complaint. Summary judgment will also be granted on statute of limitations grounds as to any of plaintiff's claims under 42 U.S.C. § 1983 insofar as they are based upon events occurring prior to December 7, 1985.

The court will grant defendant Dewey Beach's motion for summary judgment on plaintiff's remaining section 1983 claims against it. The court will also grant summary judgment as to plaintiff's federal procedural due process claim. Summary judgment will be granted on the merits with regard to plaintiff's section 1983 claims based upon the equal protection and privileges and immunities clauses of the federal constitution.

Summary judgment will be denied with regards to the merits of plaintiff's federal substantive due process claim. At trial, plaintiff may proceed against defendant Fader in his individual capacity on his substantive due process claim under section 1983 based upon events occurring after December 7, 1985.

An order will issue reflecting the above holdings.